# Exhibit B

1  **BLANK ROME LLP**
   Howard M. Knee (#55048)
2  Colleen A. Carolan (#210755)
   1925 Century Park East
3  Suite 1900
   Los Angeles, CA 90067
4  Telephone: (424) 239-3439
   Facsimile: (424) 239-3414
5

6  W. Scott Simmer
   Thomas J. Poulin
7  600 New Hampshire Avenue, NW
   Washington, DC 20037
8  Telephone: (202) 772-5800
   Facsimile: (202) 772-5858
9

10 **SEEGER WEISS LLP**
   Stephen A. Weiss
11 David R. Buchanan
   Eric H. Jaso
12 Asa R. Danes
   77 Water Street
13 New York, NY 10005
   Telephone: (212) 584-0700
14 Facsimile: (212) 584-0799
15

16 *Attorneys for Relators*

17        **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

18           **FOR THE COUNTY OF LOS ANGELES**

19
   PEOPLE OF THE STATE OF CALIFORNIA *ex*     Case No.: BC496620-MHS
20 *rel.* Schirrell Johnson, Lisa Alexander, and
   James Goan, Relators,                       **FIRST   AMENDED   COMPLAINT**
21                    Plaintiffs                **FOR  VIOLATION  OF  CAL.  INS.**
                                                 **CODE  §  1871.7;  DEMAND  FOR**
22        vs.                                    **JURY TRIAL**

23 WARNER    CHILCOTT   PLC,   WARNER
   CHILCOTT  CORP.,  WARNER  CHILCOTT
24 (US), LLC, and JOHN DOES 1-100

25                    Defendants

26

27 **FIRST AMENDED COMPLAINT FOR DAMAGES UNDER CALIFORNIA
   INSURANCE CODE § 1871.7 AND DEMAND FOR JURY TRIAL**

28

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

MAR 21 2014

Sherri R. Carter, Executive Officer/Clerk
By Anabella Figueroa, Deputy

# TABLE OF CONTENTS

I.    INTRODUCTION ......................................................................................................1

II.   PARTIES ...................................................................................................................2

    A.   Plaintiff/Relator Schirrell Johnson............................................................2

    B.   Plaintiff/Relator Lisa A. Alexander ...........................................................2

    C.   Plaintiff/Relator James P. Goan.................................................................3

    D.   Defendant Warner Chilcott ........................................................................4

    E.   Defendants John Does 1-100 ....................................................................10

III.  JURISDICTION AND VENUE .............................................................................10

IV.   GENERAL FACTS AND ALLEGATIONS ..........................................................10

    A.   Statutory Background ...............................................................................10

    B.   Sales Representatives Pressured to Sell at Any Cost or Be Fired............12

    C.   Flagrant Violations of Its Own Compliance Rules ..................................17

    F.   Concealment of Illegal Activity by Limiting Documentation and Paying
        Off Dissenting Sales Representatives .......................................................20

    G.   Illegal Practices Directed by Senior Executives .....................................21

V.    FACTS AND ALLEGATIONS REGARDING KICKBACKS  TO HEALTH
     CARE PROFESSIONALS .......................................................................................22

    A.   Warner Chilcott Used Kickbacks to Induce Health Care Professionals to
        Prescribe Its Drugs...................................................................................22

        1.   Med Eds and Speaker Fees .............................................................22

             (i)    Overview..............................................................................22

             (ii)   Med Eds to Induce Prescribing of Actonel®................................33

             (iii)  Med Eds to Induce Prescribing of Atelvia®.................................36

             (iv)  Med Eds to Induce Prescribing of Asacol® (400 mg) and

                  Asacol® HD.............................................................................44

i

(v)     Med Eds to Induce Prescribing of Doryx® ....................................45

2.     Gifts and Entertainment ...........................................................47

3.     Preceptorships...........................................................................48

B.     Warner Chilcott's Kickbacks Caused the Submission of False Claims ...............49

VI.   FACTS AND ALLEGATIONS REGARDING FALSIFICATION OF PRIOR
      AUTHORIZATION REQUESTS ....................................................................53

A.     Warner Chilcott's Sales Representatives Falsified, and Induced Staff to
       Falsify, Prior Authorization Requests.......................................................53

1.     Falsification of Prior Authorization Requests for Atelvia®......................59

2.     Falsification of Prior Authorization Requests for Doryx®.......................63

B.     Warner Chilcott's Falsification of Prior Authorization Requests Violated
       Cal. Ins. Code §§ 1871.7(a) & 1871.7(b) ..............................................67

CAUSE OF ACTION (Violation of the Insurance Fraud Prevention Act, Cal. Ins. Code
§§ 1871.7(a) & 1871.7(b))..............................................................................69

PRAYER FOR RELIEF ...................................................................................71

ii

COME NOW RELATORS SCHIRRELL JOHNSON, LISA ALEXANDER, and JAMES GOAN on behalf of the PEOPLE OF THE STATE OF CALIFORNIA and complain and allege as follows:

## I.   INTRODUCTION

1.      Relators Schirrell Johnson, Lisa Alexander, and James Goan bring this action pursuant to Cal. Ins. Code § 1871.7 to recover penalties and damages arising out of the fraudulent and illegal promotional practices of Warner Chilcott plc, Warner Chilcott Corp., and Warner Chilcott (US), LLC (collectively "Warner Chilcott" or "the Company").

2.      From at least 2009, and as early as 2003, Warner Chilcott has been engaged in a course of fraudulent and illegal conduct in its promotion of the drugs Actonel®, Atelvia®, Asacol®, Asacol® HD, Doryx®, Enablex®, Estrace®, Loestrin® 24 Fe, and Lo Loestrin® (collectively "Warner Chilcott's drugs"). This illicit conduct has been targeted at providers, pharmacists, and insurance companies, and it has included paying kickbacks to physicians and their staffs as well as submitting fraudulent prior authorization requests. Specifically, Warner Chilcott has given providers and their staffs expensive meals, speakers fees, preceptorship fees, and other gifts in order to induce them to, and reward them for, prescribing Warner Chilcott's drugs. Warner Chilcott has also falsified, and caused providers and their staffs to falsify, prior authorization requests for payment of its drugs.

3.      Warner Chilcott has sought to conceal its illegal scheme by erecting a façade of compliance, misinstructing sales representatives regarding the relevant laws, and purchasing the silence of any employee who threatens to disclose the Company's illegal conduct.

1

## II. PARTIES

### A. PLAINTIFF/RELATOR SCHIRRELL JOHNSON

4.     Plaintiff/Relator Schirrell Johnson is a resident of Los Angles, California. She graduated from the University of Southern California with a degree in business administration and was employed by Procter and Gamble Pharmaceuticals ("P&GP") as a Specialty Account Manager from 2000 until 2009. In November 2009, when Warner Chilcott acquired P&GP, Relator Johnson became a Warner Chilcott employee. As a Specialty Account Manager at Warner Chilcott, Relator Johnson promoted Actonel®, Atelvia®, Estrace® Cream, Enablex®, and Loestrin® 24 Fe. Relator Johnson was laid off in December 2011 while on medical disability leave.

2.     Relator Johnson is an original source of the allegations in this First Amended Complaint, and these allegations are not based upon publicly disclosed information. Prior to the filing of the original complaint she provided the district attorney and insurance commissioner of California with written disclosure of substantially all material evidence and information that she possessed, including thousands of pages of documents, in accordance with Cal. Ins. Code § 1871.7(e)(2).

### B. PLAINTIFF/RELATOR LISA A. ALEXANDER

3.     Plaintiff/Relator Lisa Alexander ("Relator Alexander") is a resident of Marquette, Michigan. She graduated *cum laude* from Northern Michigan University with a BA in economics and was employed by P&GP as a Senior Account Manager from 2003 until 2009. In October 2009, when P&GP was acquired by Defendant Warner Chilcott, Relator Alexander became a Warner Chilcott employee. While employed at Warner Chilcott, she was a Portfolio Market Manager in the Northern Michigan territory, where she sold Actonel® 35 mg and 150 mg, Atelvia® 35 mg, Asacol® (400mg), Asacol® HD, Enablex® 7.5 mg and 15 mg, Estrace®

2

Cream, Loestrin® 24 Fe, and Lo Loestrin®.  On December 9, 2011, while on maternity leave, Relator Alexander was laid off as part of a restructuring of the Osteoporosis sales force.

4.    Relator Alexander is an original source of the allegations in this First Amended Complaint, and these allegations are not based upon publicly disclosed information.  Prior to the filing of the original complaint, she provided the district attorney and insurance commissioner of California with written disclosure of substantially all material evidence and information that she possessed, including thousands of pages of documents and numerous voice recordings, in accordance with Cal. Ins. Code § 1871.7(e)(2).

**C.    PLAINTIFF/RELATOR JAMES P. GOAN**

5.    Plaintiff/Relator James Goan ("Relator Goan") is a resident of West Bloomfield, Michigan.  He has a BA in biology and physiology from Michigan State University and an MBA from the University of Detroit.  Relator Goan was employed at P&GP for over twenty years, during which he held various positions: Territory Sales Representative (1986-1990); Teaching Hospital Account Manager (1991-2005); Managed Care Account Manager, Cardiac Specialist, Field Sales Representative, and finally Strategic Market Manager (2006-2009).  When P&GP's pharmaceutical business was acquired by Defendant Warner Chilcott in October 2009, Relator Goan became a Warner Chilcott employee.  While employed at Warner Chilcott, he was a Dermatology and Gastroenterology Market Manager, selling Asacol® (400 mg), Asacol® HD, and Doryx® 150 mg.

6.    On April 27, 2011, Relator Goan was fired for his refusal to participate in Warner Chilcott's illegal market scheme, which had caused recurring conflicts with his manager, Jacob Hawkins.  On the day after he was fired, Relator Goan sent a letter to five Warner Chilcott managers — including CEO Roger Boissonneault and then-President Carl Reichel — describing

3

1    the numerous illegal practices in which he had been instructed to participate, and stating that his

2    refusal to do so had been the reason for his termination.

3        7.    Relator Goan is an original source of the allegations in this First Amended

4    Complaint, and these allegations are not based upon publicly disclosed information. Prior to the

5    filing of the original complaint, he provided the district attorney and insurance commissioner of

6

7    California with written disclosure of substantially all material evidence and information that he

8    possessed, including thousands of pages of documents and numerous voice recordings, in

9    accordance with Cal. Ins. Code § 1871.7(e)(2).

10       **D.    DEFENDANT WARNER CHILCOTT**

11       8.    Defendant Warner Chilcott plc is a for-profit company that is organized, exists,

12   and does business under and by virtue of the laws of Ireland, with its office and principal place

13

14   of business located at 1 Grand Canal Square, Dockland, Dublin 2.  At least until its acquisition

15   by Actavis plc on or about October 1, 2013, Warner Chilcott plc's office and principle place of

16   business was located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129, and Warner

17   Chilcott plc traded on the NASDAQ Stock Market under the symbol WCRX.  Warner Chilcott

18   plc is now a wholly owned subsidiary of Actavis plc, a global generic and specialty

19   pharmaceuticals company that trades on the New York Stock Exchange under the symbol ACT.

20   Through its direct and indirect subsidiaries, Warner Chilcott plc is engaged in the discovery,

21   development, manufacturing, and distribution of pharmaceutical products including Actonel®,

22   Asacol® (400 mg), Asacol® HD, Atelvia®, Doryx®, Enablex®, Estrace® Cream, Loestrin®,

23

24   and Lo Loestrin® in the United States.

25       9.    Warner Chilcott plc maintains a substantial presence and has maintained

26   continuous, systematic, and substantial contacts with California and the United States, including

27   in this judicial district. Warner Chilcott plc and its subsidiaries marketed and sold substantial

28                                            4

1   quantities of its drug products in California and the United States, including in this judicial

2   district. Warner Chilcott plc not only benefited from the acts of its wholly owned affiliates and

3   subsidiaries, but was directly involved in the violations alleged herein.

4
5       10.     Until their acquisition by Actavis plc in October 2013, Warner Chilcott plc and its

6   U.S. subsidiaries all maintained their principal places of business in the United States at the same

7   location in Rockaway, New Jersey.

8       11.     At least until their acquisition by Actavis plc, Warner Chilcott plc and Warner

9   Chilcott Corporation shared common officers and directors. For example, Roger M.

10  Boissonneault, the Chief Executive Officer of Warner Chilcott plc, also served as a Director of

11  Warner Chilcott Corporation. Paul Herendeen, Executive Vice President, Chief Financial

12
13  Officer, and a Director of Warner Chilcott plc, also served as a Director of Warner Chilcott

14  Corporation. Michael Halstead, Senior Vice President, Corporate Development, for Warner

15  Chilcott plc, was also a director of Warner Chilcott Corporation. Ryan T. Sullivan, Vice

16  President, General Counsel, and Secretary of Warner Chilcott plc, also served as Vice President

17  of Warner Chilcott Corporation. Izumi Hara, former Senior Vice President, Secretary and

18  General Counsel of Warner Chilcott plc, also served as the Senior Vice President and Deputy

19  General Counsel of Warner Chilcott Corporation.

20
21      12.     Warner Chilcott plc and its U.S. subsidiaries function as one, integrated entity.

22  Warner Chilcott plc's U.S. subsidiaries have no independent decision-making capabilities and all

23  facets of their operations are dominated, controlled and directed by Warner Chilcott plc.

24      13.     As a result of the control exerted by Warner Chilcott plc, all financial gains and

25  losses by Warner Chilcott plc's U.S. subsidiaries inure directly to the benefit or detriment of

26  Warner Chilcott plc and its shareholders.

27

28
                                        5

14.    Internet searches for Warner Chilcott Corporation and Warner Chilcott (US) LLC invariably lead to the Warner Chilcott plc website.

15.    As of August 2013, the Warner Chilcott plc website described its operations as encompassing its operations in the United States, without differentiating between Warner Chilcott plc, on the one hand, and its U.S. subsidiaries, on the other. Thus, next to the heading "About Warner Chilcott," the website stated:

> Warner Chilcott is a leading specialty pharmaceutical company currently focused on the women's healthcare, gastroenterology, dermatology and urology segments of the branded pharmaceuticals market, primarily in North America. We are a fully integrated Company with internal resources dedicated to the development, manufacturing and promotion of our products.

http://www.wcrx.com (last visited Aug. 15, 2013).

16.    Warner Chilcott plc's Annual Report for 2012 likewise described Warner Chilcott plc as a "fully integrated company with internal resources dedicated to the development, manufacture and promotion of our products," focused on markets "primarily in North America." Although most of the financial information included in the annual report was presented in consolidated fashion, the report broke out U.S. sales for Atelvia® and Asacol®, which accounted for 86.1% and 90.6% of the products' worldwide sales, respectively.

17.    The intimate relationship between Warner Chilcott plc and its U.S. subsidiaries reflects that Warner Chilcott plc had significant involvement in the fraudulent scheme, in which fraudulent marketing practices were integrally entwined with Warner Chilcott plc's drug development strategy to pursue minimally differentiated follow-on products with little-to-no sales potential absent support from fraudulent marketing practices. *See,* ¶¶ 137, 173-75, *infra.* Indeed, as alleged herein, Warner Chilcott plc CEO Roger Boissonneault and other employees of

6

Warner Chilcott plc were not only the architects, but also the instigators of the fraudulent scheme. *See* ¶¶ 68, 136, 138, *infra*.

18.     During a November 2010 meeting in Puerto Rico, CEO Boissonneault personally instructed Warner Chilcott sales managers from across the United States to engage in the illegal marketing practices alleged herein. *See* ¶ 59, *infra*. Boissonneault told the attendees that, because Warner Chilcott was a "European company," it could engage in these illegal promotional activities without hindrance of the PhRMA Code on Interactions with Health Care Professionals. *Id.* In making this statement, Boissonneault did not differentiate between Warner Chilcott plc (the "European company") and its U.S. subsidiaries, reflecting the company-wide scope and unity of the fraudulent scheme.

19.     Warner Chilcott plc has itself admitted that CEO Boissonneault "pioneer[ed]" the marketing methods "employed by the company." Warner Chilcott plc Prospectus Supplement at S-116 (filed Nov. 23, 2009), *available at* www.sec.gov/edgar.shtml. In making this statement, the prospectus does not differentiate between Warner Chilcott plc and its U.S. subsidiaries. *Id.* at S-1 ("Unless otherwise noted or the context otherwise requires, references in this prospectus supplement to 'Warner Chilcott,' 'the Company,' 'our company,' 'we,' 'us' or 'our' refer to Warner Chilcott plc and its direct and indirect subsidiaries.").

20.     Thus, Warner Chilcott plc, Warner Chilcott Corporation, and Warner Chilcott (US), LLC are alter egos of one another. Working together, these entities constitute a joint enterprise that has acted to sell Warner Chilcott's specialty pharmaceutical products in this judicial district and throughout the United States. As such, each act of one entity is attributable to the other. Moreover, at all times material hereto these entities further have enjoyed an agency

and fiduciary relationship whereby each has assented to the fraudulent acts of the other with regard to the marketing and sales of Warner Chilcott's specialty pharmaceutical products.

21.     Warner Chilcott plc, Warner Chilcott Corporation, and Warner Chilcott (US), LLC shall be referred to herein collectively as "Warner Chilcott" or "the Company," in reflection that the three entities have acted as alter egos of each other in perpetrating the fraud alleged herein.

22.     Under these circumstances, the failure to impose liability for the acts or omissions of Warner Chilcott's U.S. subsidiaries on Warner Chilcott plc would work a substantial injustice.

23.     Warner Chilcott's revenues from the sales of its drugs are substantial, and a large part of those sales are reimbursed by private health insurers.  The following table lists revenues for each of Warner Chilcott drug products during 2010 and 2011 as reported in the Company's 2011 Form 10-K.

| Drug | 2011 Revenue ($mm) | 2010 Revenue ($mm) | Increase |
|------|--------------------|--------------------|----------|
| Actonel® | $771 | $1,027 | -25% |
| Atelvia® | $33 | $5 | 523% |
| Asacol® (400 mg) and Asacol® HD | $743 | $715 | 4% |
| Doryx® | $173 | $173 | 0% |
| Enablex® | $171 | $107 | 59% |
| Estrace® Cream | $157 | $136 | 15% |
| Loestrin® 24 Fe | $396 | $342 | 16% |
| Lo Loestrin® | $63 | -- | 100% |

24.     Defendant Warner Chilcott Corporation is a wholly owned, indirect subsidiary of Warner Chilcott plc and is the direct 100% shareholder of Warner Chilcott (US), LLC.  Warner Chilcott Corporation is organized, exists, and does business under and by virtue of the laws of

the State of Delaware, with its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey, 07866-2129.

25.     Defendant Warner Chilcott (US), LLC is a wholly owned subsidiary of Warner Chilcott Corporation. Warner Chilcott (US), LLC is organized, exists, and does business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866-2129. In the original complaint, Defendant Warner Chilcott (US), LLC was mistakenly misnamed as Warner Chilcott (US) Inc. Warner Chilcott (US), LLC was the defendant that Plaintiff/Relators intended to name by Warner Chilcott (US) Inc., and Warner Chilcott (US), LLC was the subject of all allegations in the original complaint made against Warner Chilcott (US) Inc.

26.     Collectively, these entities shall be referred to herein as "Warner Chilcott" or "the Company."

27.     Warner Chilcott currently sells pharmaceutical products in the North American and Western European osteoporosis, gastroenterology, women's health care, dermatology, and urology markets. Following its spinoff from Warner-Lambert in 1996, Warner Chilcott evolved, through a series of acquisitions and divestitures, from a small seller of undifferentiated products to a fully integrated pharmaceutical company with a broad portfolio of leading branded products. The acquisition of P&GP's global branded pharmaceutical business on October 30, 2009, transformed Warner Chilcott into a global pharmaceuticals company with significant scale and geographic reach. Today, Warner Chilcott has an expanded sales force and infrastructure through which it promotes its products throughout the United States, including throughout California and in this judicial district.

**E.   DEFENDANTS JOHN DOES 1-100**

28.    John Does 1-100, fictitious names, are individuals, corporations, limited liability companies, or other lawful business entities through which Defendants do business in the United States and internationally, and who are unknown co-conspirators with Warner Chilcott in the perpetration of the scheme described herein.  To the extent that any of the conduct or activities described in this First Amended Complaint were not performed by Defendants, but by the individuals or entities described herein as John Does 1-100, fictitious names, any reference herein to Defendants under such circumstances, and only under such circumstances, refers also to John Does 1-100 and/or other co-conspirators in Defendants' perpetration of the scheme described herein.

## III.   JURISDICTION AND VENUE

29.    This action arises under section 1871.7 of the California Insurance Code.

30.    At all times material to the Complaint, Warner Chilcott regularly conducted substantial business within California, maintained permanent employees in California, and made and is making significant sales within California.  Warner Chilcott is thus subject to personal jurisdiction in California.

31.    Venue is proper in this district because Warner Chilcott transacts business in this district.

## IV.   GENERAL FACTS AND ALLEGATIONS

**A.   STATUTORY BACKGROUND**

32.    The legislative findings and declarations associated with section 1871.7 make clear that the Legislature was concerned with the costs imposed on private insurers by health fraud:  "Health insurance fraud is a particular problem for health insurance policyholders. Although there are no precise figures, it is believed that fraudulent activities account for billions

10

of dollars annually in added health care costs nationally. Health care fraud causes losses in premium dollars and increases health care costs unnecessarily." Cal. Ins. Code § 1871.7(h).

33. California Insurance Code § 1871.7(a) prohibits the knowing employment of "runners, cappers, steerers or other persons to procure clients or patients ... to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim again an insured individual or his or her insurer."

34. California Insurance Code § 1871.7(b) subjects any person who violates section 1871.7(a) or sections 549, 550, or 551 of the California Penal Code to civil penalties of between $5,000 and $10,000, plus an assessment of not more than three times the amount of each claim for compensation, as defined pursuant to a contract of insurance.

35. California Penal Code § 549 makes it illegal for any firm or corporation to "solicit[], accept[], or refer[] any business to or from any individual or entity with the knowledge that, or with reckless disregard for whether" that individual intends to make or cause to be made any false or fraudulent claim for payment of a health care benefit.

36. California Penal Code § 550(a)(5) makes it unlawful to "[k]nowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim," or to aid, abet, solicit, or conspire with any person do so the same.

37. California Penal Code § 550(a)(6) makes it unlawful to "[k]nowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit," or to aid, abet, solicit, or conspire with any person do so the same.

38. California Penal Code § 550(b)(1) makes it unlawful to "[p]resent or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for

11

payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact," or to knowingly assist or conspire with any person to do the same.

39.     California Penal Code § 550(b)(2) makes it unlawful to "[p]repare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact," or to knowingly assist or conspire with any person to do the same.

40.     In addition, California Business & Professional Code § 650(a) provides that "the offer, delivery, receipt, or acceptance by any person licensed under this division or the Chiropractic Initiative Act of any rebate, refund, commission, preference, patronage dividend, discount, or other consideration, whether in the form of money or otherwise, as compensation or inducement for referring patients, clients, or customers to any person, irrespective of any membership, proprietary interest, or coownership in or with any person to whom these patients, clients, or customers are referred is unlawful."

41.     Through its provision of kickbacks and falsification of prior authorization requests, as described *infra*, Warner Chilcott violated each of the preceding provisions. By doing so, it substantially increased costs to private insurers in California.

42.     The general facts and allegations described in this section IV apply to, and are hereby incorporated by reference into, each of the proceeding sections V through VII.

**B.     SALES REPRESENTATIVES PRESSURED TO SELL AT ANY COST OR BE FIRED**

43.     From the time Relators joined Warner Chilcott in November 2009 until a reorganization in May 2010, Warner Chilcott employed approximately 750 sales representatives,

12

who were divided into five divisions:  Gastroenterology/Dermatology specialty representatives, who marketed Asacol® HD and Doryx®; Dermatology specialty representatives, who marketed only Doryx®; Urology specialty representatives, who marketed Enablex® and Estrace® Cream; Women's Health care representatives, who marketed Loestrin® 24 Fe, Lo Loestrin®, and Estrace® Cream; and Primary Care representatives, otherwise known as Osteoporosis representatives.  Primary Care representatives were further subdivided into two groups: the main sales force marketed Actonel® and Enablex® until January 2011, when it began marketing Atelvia® and Enablex®; and a smaller portfolio sales force of 20 sales representatives marketed Actonel®, Asacol® HD, Enablex®, Estrace® Cream, and Loestrin® 24 Fe until January 2011, when they ceased marketing Actonel® and began marketing Atelvia®.  Gastroenterology and portfolio sales representatives resumed promotion of Asacol® (400 mg) in late 2011.

44.    As a means of determining who will receive bonuses and who will be fired, Warner Chilcott has "force ranked" sales representatives and managers against their peers.  The Company has expected managers to fire underperforming sales representatives, and anyone ranked in the bottom 30% by sales has automatically been deemed underperforming and fired. The result has been a competitive and contentious culture in which sales representatives continuously fear for their jobs, fostering a 'do whatever it takes to get the sale' mentality.

45.    District managers have been subjected to similarly intense pressure.  During ride alongs with Relator Johnson in the months following the P&GP acquisition, District Manager ("DM") Tina Hendrixson conveyed to Johnson the dynamics of weekly conference calls with President Reichel, Western Regional Sales Director ("RSD") Sirine Tabbara, and the Western district managers.  On the calls, Reichel explicitly called out and threatened the jobs of managers

with subpar sales, leaving managers in a state of constant fear analogous to that of sales representatives.

46.     Shortly following Warner Chilcott's acquisition of P&GP, DM Hendrixson advised Relator Johnson to leave the Company, telling Relator Johnson that she wasn't suited to Warner Chilcott's aggressive sales environment.     Warner Chilcott sales representatives, Hendrixson told Relator Johnson, are 'type A crazies' who actively and forcefully confront physicians who don't prescribe the Company's drugs.

47.     At the end of the second trimester of 2010, then-President of Pharmaceuticals W. Carl Reichel expressed his desire to fire 90% of Warner Chilcott's Primary Care sales representatives because they had largely negative share growth for Actonel®, which was facing significant pressure from generic Fosamax®.     At another time, he referred to sales representatives as soccer balls, explaining: Kick them to get them moving; when they stop, kick them again; when they run out of air, go get a new soccer ball.     Reichel frequently told new hires: You produce, or you're fired.     He expressed pride when discussing the 30% yearly turnover rate for sales representatives, which was largely driven by forced resignations and terminations.

48.     Warner Chilcott has employed a distinctive hiring bias.     It has hired, almost exclusively, women in their early- to mid-20s without any prior pharmaceutical sales experience. During a Plan of Action ("POA") meeting in July of 2010, which included representatives from Michigan, Wisconsin, Illinois, and Minnesota, almost every one of the 25 to 30 newly hired sales representatives fit this characterization. (Plan of Action meetings were held regularly to update and train sales representatives on the Company's marketing practices.)  None of the new hires to the Primary Care sales force was male, and none appeared to be over the age of 30.

14

49.     On April 17, 2012, Relator Goan spoke with sales representative Timothy Toups, who told Relator Goan about a recent conversation between Toups and his district manager, Connie Stubblefield. DM Stubblefield told Toups that she recently had two options to fill an open position for an Atelvia® sales representative: one was an experienced pharmaceutical sales representative; the other was an Enterprise Rent-A-Car sales representative with no pharmaceutical experience. Stubblefield's manager, RSD Sirine Tabbara, whose responsibility included California, attended the third round of interviews with the candidates. There she told Stubblefield that she could not hire the experienced pharmaceutical sales representative. Warner Chilcott, Stubblefield said, did not hire sales representatives with pharmaceutical experience because they were not willing to promote the Company's products in the manner that it expected.

50.     This lack of experience has been key to facilitating Warner Chilcott's rogue compliance culture. There were minimal compliance functions of any kind, and those that did exist were clearly intended as pro forma gestures, which managers expressly instructed sales representatives to ignore. Even in the present environment of widespread civil and criminal fines levied on other pharmaceutical companies, Warner Chilcott's compliance violations have remained flagrant and pervasive throughout the organization.    Sales representatives — particularly former P&GP representatives — who complain about these violations have invariably been "packaged out" of the Company, that is, given severance packages in exchange for their silence.

51.     In the year following the P&GP merger, Warner Chilcott fired or "packaged out" the majority of the 700 P&GP representatives it had acquired. These firings were largely driven by senior management's belief that that P&GP representatives were not willing to engage in the illegal practices that formed the crux of Warner Chilcott's business model.    According to

1   Managed Care Account Executive Gary Rojewski, national Director of Gastroenterology Amber

2   Boissonneault referred to legacy P&GP representatives as "pussies" during a managers meeting

3   in or around July 2011.

4       52.     Warner Chilcott then replaced the fired P&GP sales representatives with the type

5   of sales representatives described above, i.e., those lacking in pharmaceutical sales experience.

6   The salaries of these new representatives were on average half those of their P&GP predecessors:

7   the average salary for a P&GP representative was approximately $90,000; for a Warner Chilcott

8   representative, it was $45,000.  As a result, Warner Chilcott's sales force has been composed of

9   representatives with minimal pharmaceutical sales experience.  As of March 2011, nearly 70% of

10  the Company's sales representatives had joined the Company within the past six months.

11      53.     While sales representatives who refused to participate in the Company's illegal

12  marketing scheme were fired, active proponents of the scheme received promotions. On April 1,

13

14  2011, Warner Chilcott sent an email announcing the promotion of a handful of sales

15  representatives to "Grade Level 2" representatives, otherwise known as "Field Sales Trainers."

16  Relators each recognized a number of names on this list because managers had held up their

17  illicit behaviors as 'best practices' to be emulated.  For example, at approximately the same time

18  he was promoted, Prabhakar ("Mo") Polani, from the San Jose territory, was praised in a

19

20  voicemail distributed to the national sales force describing Polani's "best practice" of *himself*

21  reviewing patients' files and filling out prior authorization forms for Atelvia®, which constituted

22  not only a statement to get a false claim paid but a HIPAA violation as well.  *See* ¶ 177, *infra.*

23  Similarly, Eduardo Chang, from the downtown Los Angeles territory, was promoted after being

24  held up as an example for filling out prior authorization paperwork.  *See* ¶¶ 164-168, *infra.*

25

26

27

28
                                    16

1   These sales representatives received a pay raise and became responsible for the training of newly

2   hired sales representatives.

3

      **C.**    **FLAGRANT VIOLATIONS OF ITS OWN COMPLIANCE RULES**

4

5       54.    In 2006, Warner Chilcott adopted a "Code of Business Conduct and Ethics"

6   ("Code of Ethics").   The Code of Ethics stated that members of the Company's senior

7   management would certify annually that they were "aware of and are in compliance with the

8   Company's policies on ethical behavior."   One provision of the Code of Ethics dealt with

9   customer interactions and gifts to health care professionals:

10

              It is the Company's policy that the marketing of its
11              products be evidence-based and aimed at enhancing
              the practice of medicine and appropriate patient
12              care. Interactions with healthcare professionals and
              other customers must focus on (1) providing
13              current, accurate, and balanced information about
              Company products, and (2) transmitting sound
14              scientific and educational information. In no case
              shall Company employees offer or pay anything of
15              value to a healthcare professional, or other person
              or entity in a position to influence prescribing, in
16              order to induce them to purchase, prescribe, use,
17              recommend, or dispense a Company product.

18       55.    Another provision required compliance with patient privacy laws: "It is Company

19   policy to comply with the applicable privacy and data protection laws, regulations and treaties in

20   order to protect ... from inappropriate or unauthorized use or disclosure."   Accordingly, the Code

21   of Ethics further provided that "[c]olleagues may not acquire, use, or disclose individual

22

23   colleague, consumer, customer or patient information in ways that are inconsistent with the

24   Company's privacy policies or with applicable laws or regulations."

25       56.    Beginning at least as early as 2009, the Company and its top management,

26   including CEO Roger M. Boissonneault and President Reichel, have routinely and flagrantly

27   violated these and other provisions of the Code of Ethics.   Not only did they know of the

28

Company's widespread illegal conduct such as kickbacks to health care providers and falsification of prior authorization requests, they actively advocated this conduct and were instrumental in ensuring that it was a requisite component of every sales representative's job performance.

57.     Most pharmaceutical companies that promote drugs in the United States voluntarily follow the Pharmaceutical Research and Manufacturers of America's *Code on Interactions with Healthcare Professionals*, more commonly known as the "PhRMA Code." The PhRMA Code, first adopted in 2002 and amended in 2008, sets forth ethical standards for relationships between health care professionals and pharmaceutical and biotechnology companies. The PhRMA Code places specific limitations on interactions between health care professionals and manufacturer representatives. It requires that the content of Continuing Medical Education programs remain independent of manufacturer influence; that sales representatives receive compliance training and be held to its standards; and that any items provided to health care professionals be less than $100 and not of value outside their professional responsibilities.

58.     California law requires that any pharmaceutical company doing business in the State "adopt a Comprehensive Compliance Program that is in accordance with the April 2003" version of the PhRMA Code. Cal. Health & Safety Code § 119402(a). The statute also specifically requires pharmaceutical companies to implement specific dollar limits on gift and activities to providers that conform to the PhRMA Code. Each year since 2005, Warner Chilcott has certified to the State of California, pursuant to California Health & Safety Code § 119402, that it has adopted a "Comprehensive Compliance Program" that complies with the PhRMA Code.

18

59.     Even though Warner Chilcott has certified that it has agreed to comply with the PhRMA Code's restrictions on physician gifts and entertaining, it is not a PhRMA Code signatory.  During a managers meeting held in Puerto Rico in November 2010 and attended by managers from every sales division as well as selected top sales representatives, CEO Boissonneault announced that because Warner Chilcott was a European Company, it was not required to follow the PhRMA Code.  President Reichel made similar statements on numerous occasions.  For example, at a meeting held in Chicago, Illinois in September 2009, at which Warner Chilcott's senior management met with the 400 to 500 P&GP representatives that Warner Chilcott would soon be acquiring, a representative asked Reichel how Warner Chilcott was allowed to take doctors and their staffs out two to three nights per week without violating the PhRMA Code.  Reichel responded:  We can do it because we weren't foolish enough to become a member of PhRMA.  He continued: We are a European company.

60.     Despite the flagrance of the Company's violations and the candidness with which its management acknowledges — and even, at times, takes pride in — those violations, Warner Chilcott has attempted to maintain a thin façade of compliance through periodic memoranda and presentations.  In addition, the Company has required that all sales representatives each year sign documents certifying that they are unaware of any illegal practices at Warner Chilcott.  The documents state that employees must immediately notify Warner Chilcott's legal department of any violations of which they become aware, and that employees make themselves legally responsible for the financial impact of any judgments against the Company.

61.     Having expressly instructed its employees to behave otherwise, Warner Chilcott is aware that these certifications were false and were only signed under its coercive pressure.  The *pro forma* nature of these compliance measures was also readily understood by sales

19

representatives, whose district managers expressly informed them that the purpose of the measures was to protect the Company. Sales representatives, their managers instructed them, should proceed just as they had previously.

62.   Warner Chilcott's compliance policies have been used not to promote actual compliance, but rather to conceal the Company's illegal conduct and protect senior managers from accompanying legal consequences.

### F.   CONCEALMENT OF ILLEGAL ACTIVITY BY LIMITING DOCUMENTATION AND PAYING OFF DISSENTING SALES REPRESENTATIVES

63.   Aware that it has been engaged in widespread illegal activity, Warner Chilcott has taken concerted steps to attempt to conceal that conduct and limit the evidence thereof.

64.   Many representatives, including Relators, have been regularly told that Warner Chilcott does not like documentation. As a result, representatives have seldom received email and have likewise been encouraged to send it infrequently. If they have concerns, representatives have been instructed to leave voicemail messages or talk via cell phone only to management. Additionally, for "legal reasons," sales representatives have been expressly instructed *not* to detail any of their interactions with physicians in their call notes. Emails and voicemail have been deleted every two weeks to prevent leaving a trail, and files on representatives' hard drives have been purged on a regular basis.

65.   Any employee who reports compliance violations has been "packaged out" of the Company with a severance agreement that includes a gag clause precluding the employee from disclosing Warner Chilcott's pervasive illegal practices. Warner Chilcott has repeatedly forced employees to engage in illegal practices, then intimidated and bought the silence of those who threaten to disclose them.

20

### G.   ILLEGAL PRACTICES DIRECTED BY SENIOR EXECUTIVES

66.    As detailed throughout this First Amended Complaint, Warner Chilcott's fraudulent marketing scheme has been developed and implemented by the Company's senior executives and managers, among whom Director of Sales Nicola Crawford, Regional Sales Director Sirine Tabbara, and President of Pharmaceuticals Carl Reichel have been some of the most vigorous proponents.   Management has made participation in the Company's scheme of kickbacks and falsification of prior authorization requests core requirements of both sales representatives' and managers' job performance.

67.    The Company's illegal practices have continued unabated, even following the departure of President of Pharmaceuticals Carl Reichel, which was announced on August 5, 2011. The press release did not state a reason for Reichel's departure, although the consensus among sales representatives was that he was fired as the result of poor sales.  He was replaced by Marinus Johannes "Hans" van Zoonen, who previously served as Warner Chilcott's President of Europe/International & Marketing after joining the company as part of the P&GP acquisition.

68.    This continuation of Warner Chilcott's illegal practices even in the absence of Reichel, who was one of their primary drivers, has been partly attributable to the personal influence of CEO Roger Boissonneault.   CEO Boissonneault has for a long time personally exerted control over all areas at Warner Chilcott.   While Boissonneault fired President Reichel due to underperforming sales, Reichel was in reality a puppet, and the practices he implemented were largely the ones that Boissonneault directed him to implement.

69.    Not even receipt of a subpoena, announced in the Company's 10-K filed on February 24, 2012, has caused the Warner Chilcott to stem its illegal sales practices.  In response to an analyst's question regarding the Government's investigation during an earnings call in February 2012, CFO Herendeen responded, "[I]t's something that, if you are in this business, it

happens." He reiterated, "You know, it happens." Transcript, *Q4 2011 Warner Chilcott PLC Earnings Conference Call – Final* (Feb. 24, 2012), *available at* LEXIS FD (Fair Disclosure) Wire.

## V.     FACTS AND ALLEGATIONS REGARDING KICKBACKS TO HEALTH CARE PROFESSIONALS

### A.    WARNER CHILCOTT USED KICKBACKS TO INDUCE HEALTH CARE PROFESSIONALS TO PRESCRIBE ITS DRUGS

70.    The centerpiece of Warner Chilcott's scheme, beginning as early as 2003, has been a diversity of kickbacks intended to influence not only physicians but their staffs as well. The most common form of kickback has been the Med Ed — a "happy hour" by another name — aimed at buying the loyalty of both the paid speakers and the physician and staff attendees. Kickbacks paid by the Company have also included golf trips, preceptorships, and assorted other gifts, all of which have been bankrolled through massive sales representative budgets of $15,000 to $20,000 per representative per month, or $180,000 to $240,000 per year. This strategy of quid pro quos was intended to, and did, induce physicians to prescribe, and in turn staff members to facilitate, prescriptions of Actonel®, Asacol® HD, Atelvia®, Doryx®, Enablex®, Estrace Cream®, Loestrin® 24 Fe, Lo Loestrin®, and other Warner Chilcott drug products to California private insurer beneficiaries. As a result, private insurers reimbursed for those fraudulent prescriptions.

#### 1.    Med Eds and Speaker Fees

##### (i)    Overview

71.    Warner Chilcott has used kickbacks in the form of promotional speaker programs as its core tool to sell every one of its products. Despite their official designation as educational events, these programs have invariably included minimal educational content. More accurately characterized, the programs have been expensive dinners, intended not to impart knowledge but

to induce the attendees to prescribe Warner Chilcott's drugs. In exchange for speaking fees and/or attendance at these dinners, sales representatives have successfully obtained physicians' commitment to prescribe Warner Chilcott's products as well as staff members' commitment to submit fraudulent prior authorization requests. Managers have instructed sales representatives to 'beat doctors into the ground' if they attend Warner Chilcott's dinners but do not prescribe its drugs.

72.    This strategy was in violation of California law, as well as Warner Chilcott's own Code of Business Conduct and Ethics, both of which prohibit pharmaceutical companies from providing anything of value to health care professionals in exchange for prescriptions. Nonetheless, Warner Chilcott managers and sales representatives have openly discussed using speaker fees as leverage to induce potentially high-prescribing physicians to prescribe Warner Chilcott products. Moreover, they have successfully implemented that strategy, making it a, if not *the*, key driver of sales for Warner Chilcott's products.

73.    Warner Chilcott has used two different types of speaker programs: the first, "Didactic" programs have been traditional promotional speaker programs in which the Company has paid a speaker to present from a Company-provided slide set. This type of program has, for the most part, been discouraged by Warner Chilcott, which has viewed didactic programs as an ineffective way to induce physicians to prescribe its drugs. Consequently, didactic speaker programs have been rare. During her employment at Warner Chilcott, Relator Johnson did not host a single speaker program during which the speaker presented using a slide deck.

74.    The second, and by far most prevalent type of promotional speaker program at Warner Chilcott has been the Medical Education Event, more commonly referred to as a "Med Ed event" or simply a "Med Ed." This, however, is a misnomer: very little education has

23

actually taken place at Medical Education events. Instead, they have been opportunities for Warner Chilcott sales representatives to wine and dine physicians and their staffs by purchasing them drinks and lavish dinners.

75. Med Ed events have been further separated into two categories: Med Eds without speakers, which are essentially dinners or happy hours with doctors and staff; and Med Eds with "roundtable speakers," commonly referred to as "roundtables," which are dinners during which one physician is paid to give a short presentation.

76. In most of the country, Med Eds without speakers have been the most common type of Med Ed. Frequently just happy hours, Med Eds without speakers have often entailed zero clinical discussion of Warner Chilcott's drug products, and have thus been the Company's most blatant form of kickback to physicians and staff. However, because California law prohibits pharmaceutical companies from providing meals to health care professionals outside the context of educational events, *see* ¶ 58, *supra*, Warner Chilcott has not conducted Med Eds without speakers in California. Instead, the Company has conducted only Med Ed events *with* speakers in California, in order to create a façade of compliance. This façade, however, has remained just that: a façade. In substance, the educational component of roundtable events has remained minimal, and the events have served foremost as kickbacks to the speakers and attendees.

77. The typical roundtable program has been a two-to-three hour dinner at an expensive restaurant, during which "speakers" have simply shared their opinions about Warner Chilcott's products. Speakers have not used slide decks, and have rarely had prepared remarks. While all the programs have been intended as blatant kickbacks to both the speakers and attendees, in the most egregious examples, speakers have been paid to present at dinners attended

24

solely by their own employees. At many other programs, no audience has attended or has even been invited. In these cases, the speaker has been paid an honorarium for attending a dinner with only a Warner Chilcott sales representative.

78. Warner Chilcott has leveraged roundtable programs as two kickbacks in one. Not only has Warner Chilcott used the events to induce attendees to prescribe its drugs, it has also used speaker fees as *additional* inducements to the speakers themselves. Warner Chilcott has selected speakers for their high market volume (decile) and high potential for prescribing Warner Chilcott products. On occasion, low-volume (-decile) physicians, nurse practitioners, and physician assistants have been selected for their connections to higher prescribing physicians.

79. Doctors have regularly been told that to become Warner Chilcott speakers they must first become prescribers of its drugs, and like the other attendees, Warner Chilcott has held speakers "accountable" for prescribing its drugs. During business discussions, sales representatives have informed the physician that he or she "owes" it to the representative and Warner Chilcott to prescribe Warner Chilcott's drugs. Speakers who have not prescribed sufficient quantities have been first threatened with being dropped, then dropped as speakers if their prescriptions have failed to increase.

80. Around early 2010, District Manager Tina Hendrixson instructed sales representatives in her district how to have a "business conversation" with a physician who was not prescribing sufficient Actonel® in exchange for either speaking fees or attendance at Med Ed events. Hendrixson instructed not to have the conversation in front of staff, but that it was appropriate to confront the physician with his or her prescribing numbers.

81.     In other instances, explicit business discussions have been unnecessary, as physicians and staff have understood the terms of the arrangement and prescribed Warner Chilcott's drugs on their own initiative.

82.     DM Hendrixson routinely reviewed the recent prescribing history of Relator Johnson's physicians, and based on the quantity of Warner Chilcott drugs prescribed, advised Relator Johnson on which physicians should or should not serve as speakers. While DM Hendrixson initially advocated that Relator Johnson enroll Dr. A.M. as a speaker in order to induce him to convert his patients from Actonel® to Atelvia®, after his Atelvia® prescribing remained low DM Hendrixson confronted him and told him that he needed to increase his prescribing if he wished to remain a speaker. When he failed to do so, Hendrixson removed him from the speakers' list. In a coaching reported dated February 17, 2011, Hendrixson wrote, "[A.M.]'s staff had no rejections [from insurers] because he hasn't written [Atelvia®]. I have removed him from the Regional Speaker list because I am not happy with his excuses." On March 30, 2011, District Manager Jake Hawkins accompanied Relator Goan on a "ride along," during which the two men called on a number of physicians. Following this ride along, DM Hawkins prepared a "Sales Representative Performance Evaluation & Coaching Report." In the evaluation, DM Hawkins criticized Relator Goan for failing to effectively use Med Ed events and speaker programs to "gain business" from physicians. Hawkins explicitly admitted that Med Eds are intended as inducements to physicians when he wrote under the heading "Goal #4: Effectively use SPE and Med Ed money":

> ...this money is used in order to gain business from the offices. You can spend money on these offices, but if you don't effectively use this to drive your business, it is useless... Until you get the support from these offices, they don't deserve the things you have been doing for them.

26

Relator's Goan's evaluation was sent via email to National Vice President for Gastroenterology and Dermatology Nicola Crawford as well as Sales and Marketing Coordinator Mary Keslo and Human Resources Coordinator Lora Martocci, all of whom also had managerial responsibility for sales representatives in California. None took any action in response.

83.    In a voicemail from President Reichel to the Primary Care sales force on February 9, 2011, Reichel instructed sales representatives that "Early Experience" physicians needed to prescribe Atelvia® in order to be eligible to serve as paid speakers:

> We have to do our Med Ed programs with the doctors who were from Early Experience. If the Early Experience doctors are not writing prescriptions, then by definition, since some of you have zeros, I don't see how you can go out there and use them as a speaker.

84.    From the outset of the Company's acquisition of P&GP, Warner Chilcott's upper management expressly informed sales representatives of the centrality of Med Ed events to the Company's sales strategy. At the transfer-of-power meeting in Chicago, Illinois in September 2009, President Reichel told attendees that Med Ed events were Warner Chilcott's "competitive advantage." This statement was made in reference to the PhRMA Code, which prohibited adherents from engaging in similar activities. New previsions of the amended PhRMA Code, which took effect in January 2009, strictly prohibit member companies from providing restaurant meals to health care professionals and only allow companies to provide modest meals in health care professionals' offices or in hospitals in conjunction with educational presentations. The many PhRMA members that market drugs competing directly with Warner Chilcott's are therefore prevented from using an analogous wine and dine strategy. For example, Warner Chilcott markets: Actonel® and Atelvia® against Evista® (Eli Lilly); Loestrin® 24 Fe and Lo Loestrin® against Yaz® and Beyaz® (Bayer) and against Ortho-Tri-Cyclen® (Johnson &

27

1   Johnson); and Enablex® against Vesicare® (Astellas/GlaxoSmithKline), Detrol LA®, and

2   Toviaz® (Pfizer). Each of these competitors is a signee to the PhRMA Code.

3        85.    President Reichel indicated that Med Eds had a history of success, further stating

4

5   that the most successful sales representatives were the ones with the most Med Eds. Reichel

6   stated that wining and dining staff and physicians fostered personal relationships with Warner

7   Chilcott representatives, resulting in what he called a "culture of accountability." Although

8   Reichel did not make clear at the time that sales representatives were to demand prescriptions in

9   exchange for physicians' attendance at Med Ed events, the significance of his comments became

10   apparent after Relators were provided additional information at subsequent POA meetings.

11        86.    Because of the centrality of Med Eds to its promotional strategy, Warner Chilcott

12   has enrolled inordinately high number of speakers relative to the rest of the pharmaceutical

13   industry. In some instances, it has directed its sales force to sign up their top ten physicians as

14

15   speakers. Speaker selection has thus not been a matter of physician expertise; rather, the goal

16   has been to drive sales.

17        87.    Each Warner Chilcott representative has had a budget of $15,000 to $20,000 per

18   month, or as much as $240,000 per year, for Med Ed programs. This is nearly nineteen times

19   higher than the industry average for such events of some $13,000 per year. The Warner

20   Chilcott's "budget" has only represented the limit on representatives' credit cards. The

21   Company has tracked spending by brand, but there has been no brand limit. In theory, a

22   representative could spend his or her entire $20,000 budget to take doctors out to dinner for a

23   single product. Eduardo Chang, a sales representative in Relator Johnson's district, at one point

24   expressed concern that he had exceeded his budget; however, RSD Sirine Tabbara advised that it

25   was not a problem because his sales were high. Tabbara advised the other sales representatives

26

27

28                                                28

in Relator Johnson's district that they likewise didn't need to worry about exceeding their budgets so long as their sales were high — that is, so long as they were effectively leveraging their Med Ed funds to obtain a good return on investment.

88.    During Relators' tenure at the Company, sales representatives were required to conduct two to three Med Ed events per week. Numerous representatives were fired for failing to meeting this quota. The centrality of Med Eds to sales representatives job duties was emphasized by a new field coaching report template, implemented around August 2011, which prominently included fields for rating sales representatives on the following: "Develops Speakers (how many)," "# Med Eds last 31 days," "# Med Eds last 31 days with Speaker," "# Med Eds planned next 31 days," "# Med Eds next 31 days w/ speaker," and "Last Med Ed attended by DM [District Manager]."

89.    Around summer 2010, DM Tina Hendrixson began requiring sales representatives in the Los Angeles district to send her a list of all Med Ed lunches and dinners that they conducted during the week. Doing so allowed Hendrixson to hold sales representatives accountable for maintaining a high rate of events and to call out those who did not.

90.    The number of promotional programs that Warner Chilcott has required its sales force to conduct is, by comparison to other drug makers, extraordinary. Representatives have been expected to hold at least 12 events each month, meaning they have conducted after-hours events on at least 12 of 20 working days per month. Nonetheless, representatives who have fully embraced the Warner Chilcott philosophy have frequently conducted more than the minimum number of events per week, with some representatives conducting four, five, or more. Managers have applauded these representatives for their excessive spending. They are easily identified because they often use the entirety of their $15,000 to $20,000 budgets each month.

29

91.     Warner Chilcott sales representatives have frequently joked among themselves about the excessive quantities of money that they spent on these events, and some representatives have even considered it a challenge to see who can spend the most money on a Med Ed event. With no firm limit on spending, some events have become outlandishly expensive.

92.     While bribery of health care professionals has been a primary goal of a Warner Chilcott Med Ed event, this bribery has not been limited to doctors.  Warner Chilcott has also strongly emphasized the importance of influencing staff, particularly the staff that completes prior authorizations.  It has been Company direction to take these staff members out to fancy dinners — i.e., a Med Ed with no speaker — in order to build a relationship that will result in staff completing prior authorization forms for Warner Chilcott products.  This practice has been regular and pervasive at Warner Chilcott.  President Reichel himself advanced the message of using Med Eds as a means to influence staff to complete prior authorizations in a February 1, 2011 voicemail message to the Primary Care sales force: "[I]f you have somebody who is a medical assistant that understands the mechanics of how to work these prior auths, I think that also can be beneficial for that person to, you know, come out to dinner... So I think this has to become, you know, a core competency of Warner Chilcott is how to work with the prior auth."

93.     Warner Chilcott has ensured that it eliminates most of the evidence of its widespread use of Med Eds and concomitant lack of compliance controls, in large part by limiting documentation of who attends these events.  Until late 2011, there were no sign-in sheets to record attendees.  Part of the Company's Siebel computer management system allowed representatives to record the names of the health care professionals in attendance, but it only required that a single physician be entered by name.  For the remaining attendees, including office staff, their headcount was sufficient.  Unlike the PhRMA prohibition on taking spouses to

dinner, this practice has been common at Warner Chilcott. DM Hendrixson instructed Relator Johnson to "assume" that any spouses who attended a Med Ed event worked in their counterparts' offices, and could thus be counted as office staff.

94. This lack of tracking allowed representatives to "pad" their expense reports were it necessary for compliance purposes. That is, representatives were told by their managers that they could, for example, spend $500 on dinner and drinks for only two doctors but that they should also claim that five staff members attended as well in order to lessen the ostensible cost per person. Indeed, this policy was encouraged by Warner Chilcott expense accounting personnel.

95. In late 2011, Warner Chilcott implemented changes in accordance with the Patient Protection and Affordable Care Act's "Sunshine" provisions by *requiring* a sign-in sheet for all Med Ed event attendees, including health care professionals and non-health care professionals. The changes also removed sales representatives' ability to write free-form comments, explaining any associated issues, in the Siebel expense reporting system. It is unclear, however, whether these changes have stemmed the misreporting that had been frequent under the old, voluntary framework.

96. Not only have Warner Chilcott's speaker programs violated multiple laws and regulations that prohibit kickbacks, they have also violated FDA regulations concerning the promotional content of speaker programs, which must be limited to uses and claims supported by the FDA-approved labeling. Warner Chilcott, however, has required speakers to be unequivocally positive about its products, even when such claims are contrary to its products' labeling. Any speakers who have been too fair and balanced in their presentations or who have refused to adopt the Company's marketing line have been dropped as speakers.

31

97.     So long as its speakers have remained unfailingly positive, however, Warner Chilcott has cared little about the substance of what they say. Rather, since its primary goal is to induce them to write its products, speakers have received very little training other than a one-hour, pre-recorded online compliance tutorial. Speakers have never been tested to determine if they have actually understood or paid attention to the compliance program.

98.     While speakers have agreed by signing Warner Chilcott's Master Speaker Services Agreement to only use Company-prepared slide decks and informational materials, most roundtable speakers have not used any slides or informational materials. Instead, they have simply talked about their own experience treating patients. Accordingly, there has been no means for Warner Chilcott to ensure that the roundtable speakers provide an "educational" program supported by FDA-approved labeling, or that any claims made are based on "substantial evidence" as is legally required.

99.     In addition, sales representatives have received no compliance training about what speakers are permitted to say during promotional speaker events. Instead, representatives have simply been trained that roundtable events are an opportunity for physicians and staff members to socialize and enjoy dinner, while speaking as they wish about their own experiences with Warner Chilcott's drugs.

100.    Prior to the merger with Warner Chilcott and continuing until late 2010, all P&GP speaker programs were coordinated by Embryon, Inc., a communications company located in Bridgewater, New Jersey. Beginning in September 2010, Warner Chilcott transferred all the coordination of its speaker programs to *p*-Value Communications, a two-person company located at 400 Interpace Parkway # 2c, Parsippany, NJ 07054-1120. *p*-Value's role has been limited. It has performed no apparent compliance function. Rather, it has kept lists of active speakers as

well as past programs conducted, and paid speakers following completed programs. Beginning in early 2011, *p*-Value began handling all contract negotiations with speakers. (Previously, many representatives negotiated fees with speakers themselves.)

101. The 2010 roundtable speaker honoraria were as follows: primary care (family practice and internal medicine), $500; rheumatology, $600; orthopedic surgery, $700; OB/GYN, $700; gastrointestinal and colorectal surgery, $1500 (local) or $3000 (out of town); dermatology, $500 - $1000; and physician assistants and nurse practitioners, $500. There has been no limit to the number of Med Ed events a health care professional can be reimbursed for per year.

### (ii) Med Eds to Induce Prescribing of Actonel®

102. While at P&GP speakers had been selected based exclusively on their clinical knowledge and status as thought leaders, at Warner Chilcott most speakers were selected based on the likelihood that serving as speakers would increase their prescribing of Actonel®. As a result, the majority of Warner Chilcott's Actonel® speakers were not thought leaders at all, but only physicians who were, or had the potential to be, high prescribers. Although DM Hendrixson did ensure that Relator Johnson selected a few thought leaders, such as Dr. A.M., to anchor her list of speakers, these thought leaders were subjected to the same requirement as non-thought leaders that they prescribe a significant quantity of Actonel® in order to continue serving as paid speakers.

103. DM Hendrixson advised Relator Johnson that the ideal physicians to select as Actonel® speakers were ones who were currently large prescribers of generic alendronate or once-a-month Boniva®. These physicians, DM Hendrixson explained, were "low hanging fruit" and could easily be converted to prescribing Actonel® in exchange for serving as paid speakers.

104. Relator Johnson selected Dr. Y.K. as a paid speaker as a result of a recommendation from sales representative Eduardo Chang. Dr. Y.K. quickly became one of

33

Relator Johnson's largest prescribers of Actonel®, and as a result, also became one of Relator Johnson's most frequently used paid speakers. Between July and December 2010, Dr. Y.K. conducted 16 paid speaker programs related to Actonel®, in conjunction with which Warner Chilcott paid her $9,600.

105. Dr. Y.K.'s programs were also indicative of the role of Warner Chilcott's speaker programs as not just kickbacks to the speakers, but kickbacks to the attendees as well. Dr. Y.K. routinely invited physician with whom she was friends to her speaker programs, and many of them became regular attendees. Around 50% of guests at Dr. Y.K.'s programs were repeat attendees. As a result of their attendance, these guests increased their prescribing of Actonel®. Importantly, it was not as a result of the educational content of Warner Chilcott's speaker programs that these guests increased their prescribing of Actonel®. What educational content there was to Dr. Y.K.'s programs entailed a recitation of general information on Actonel® and competing bisphosphonates that was already known to the attendees, and not sufficiently compelling in its substance or presentation to influence the attendees to alter their prescribing habits. Instead, attendees increased their prescribing of Actonel® simply as a result of and in exchange for the expensive dinners paid for by Warner Chilcott.

106. Relator Johnson also recruited Dr. F.A. to serve as a paid Actonel® speaker, despite the objections of DM Hendrixson, who did not believe that his prescribing was high enough to justify the choice. Addressing DM Hendrixson's objection, Relator Johnson told Dr. F.A. that he needed to increase his prescribing in order to continue serving as a speaker. Between June and October 2010, Dr. F.A. served as a speaker at three programs in conjunction with which he was paid $1,800. However, his prescribing of Actonel® did not increase

34

1   sufficiently, and Relator Johnson therefore did not invite him to conduct further Actonel®

2   speaking events.

3       107.    Following the instructions of DM Hendrixson to select "low hanging fruit," see ¶

4   102, *supra*, Relator Johnson selected Dr. Y.C. to serve as an Actonel® speaker because he was a

5   high prescriber of both generic alendronate and Boniva®.  Warner Chilcott sought to use

6   speaking fees to induce Dr. Y.C. to increase his prescribing to Actonel®, and in exchange for

7   those fees, he did.  Between April and November 2010, Dr. Y.C. conducted four speaker

8   programs in conjunction with which Warner Chilcott paid him $2,300.

9

10      108.    Dr. E.F. was another of Relator Johnson's most frequent Actonel® speakers.

11  Although Dr. E.F. had already prescribed a significant quantity of Actonel® before she started

12  serving as a speaker, she also had prescribed competing bisphosphonates, and Warner Chilcott

13  sought to increase her Actonel® prescribing even further.  The speaking fees provided to Dr.

14  E.F. served as both rewards for the Actonel® that she was already prescribing as well as

15  inducements to prescribe additional Actonel®, which she did as a result of Warner Chilcott's

16  payment of speaker fees.  Between June and December 2010, Dr. E.F. conducted 22 speaker

17  programs in conjunction with which Warner Chilcott paid her $13,200.

18

19      109.    Relator Johnson selected Dr. E.L. to serve as an Actonel speaker in large part

20  because she needed a speaker who was an OB/GYN.  Dr. E.L. already prescribed a moderate

21  quantity of Actonel®; however, DM Hendrixson did not regard it as sufficient to warrant

22  allowing Dr. E.L. to continue serving as a paid speaker.  DM Hendrixson instructed Relator

23  Johnson, who instructed Dr. E.L., that he needed to increase his prescribing to continue serving

24  as a speaker.  As a result, Dr. E.L. gradually did so.  Between May and December 2010, Dr. E.L.

25  conducted five speaker programs in conjunction with which Warner Chilcott paid him $3,000.

26

27

28
                                        35

(iii)    Med Eds to Induce Prescribing of Atelvia®

110.    The centerpiece of Warner Chilcott's promotion of Atelvia® has been the use of speaker fees as kickbacks to physicians to prescribe the drug. The Company has tracked the quantity of Atelvia® that speakers' prescribe, explicitly requested that speakers' whose prescribing it considers insufficient prescribe more, and fired those who did not. The strategy has been greatly successful, and for months following the launch, the majority of Atelvia® prescriptions were written by paid speakers.

111.    Prior to its official launch in January 2011, Warner Chilcott promoted Atelvia® through an "Early Experience Program," through which it sought to sign up advocates — i.e., paid speakers — for the drug. The true focus of the program was to leverage speaker fees as kickbacks to induce these physicians to prescribe Atelvia®, and in keeping with that aim, Early Experience participants were selected primarily based on their potential to prescribe a high volume of Atelvia®.

112.    Seeking to induce as many physicians as possible, Warner Chilcott signed up speakers at a rate that greatly exceeded its legitimate educational and promotional needs. Two months following the launch of Atelvia®, as of March 1, 2011, there were already some 708 Atelvia® speakers. Nonetheless, shortly thereafter Reichel instructed sales representatives to increase their number of Atelvia® speakers ever further to nine speakers per territory, or some 3,330 nationwide.

113.    District Manager Tina Hendrixson routinely advised Relator Johnson during the Early Experience Program regarding her selection of Atelvia® speakers. Although a physician's status as thought leader might play a role in selecting that physician to be a speaker, Hendrixson continually emphasized that every speaker must also prescribe Atelvia®. Relator Johnson understood from these conversations with DM Hendrixson that she should base her selection of

36

the larger part of her speaker list — which was comprised of physicians who were not thought leaders at all — entirely on those would-be speakers' potential to become significant prescribers of Atelvia® in exchange for receipt of speaking fees.

114.   DM Hendrixson advised Relator Johnson that the "low hanging fruit," or easiest physicians to induce to prescribe Atelvia®, were those who were already prescribers of Actonel®.   These physicians, Hendrixson reasoned, should be easily converted.   Relator Johnson's selection of Atelvia® speakers therefore largely mirrored her list of Actonel® speakers, who had themselves been selected because they were, or in order to make them, strong prescribers of Actonel®.

115.   After Relator Johnson selected her speakers, DM Hendrixson continually monitored their Atelvia® prescribing and discussed with Relator Johnson which speakers' prescribing was sufficient versus insufficient.

116.   One of the most frequent paid speakers in Relator Johnson's territory remained Dr. Y.K., who was chosen as an Atelvia® speaker in order to convert Dr. Y.K. from prescribing Actonel® to prescribing Atelvia®.   In the period immediately after Dr. Y.K. signed on as a speaker, her prescribing of Atelvia® remained relatively low and DM Hendrixson questioned Relator Johnson as to how Dr. Y.K. could continue to speak without prescribing more Atelvia®. However, after a couple of months, Dr. Y.K. began to prescribe significantly greater quantities of Atelvia®, and as such, was paid to regularly speak at dinner programs.   Because Dr. Y.K. was not a thought leader, Relator Johnson frequently had difficulty finding physicians to attend dinners at which Dr. Y.K. was the speaker.   Multiple dinners had repeat attendees.   Nonetheless, because her prescribing remained high, Dr. Y.K. was frequently invited to speak two to three

times per week.  Generally the dinners included no more than five minutes' discussion of Atelvia®.  Dr. Y.K. received $6,000 in speaking fees from Warner Chilcott related to Atelvia®.

117.    Dr. F.A. also continued as a paid speaker in Relator Johnson's territory.  When signing up Dr. F.A. as a speaker, per the Company's instruction, Relator Johnson told him that he needed to gain "clinical experience" with Atelvia® to remain a speaker.  After his prescribing failed to sufficiently increase, DM Hendrixson reiterated to him that he needed to prescribe more Atelvia® to continue speaking.  He agreed to do so, and DM Hendrixson instructed Relator Johnson to return to his office the next week to hold him accountable.  Dr. F.A.'s prescribing did increase, and he conducted at least two speaking events for Atelvia®.  His prescribing, however, did not increase sufficiently, and DM Hendrixson advised that Relator Johnson remove him from the speakers' list.  Relator Johnson did not remove him from the list, but simply discontinued using Dr. F.A. as a paid speaker.  In addition to the $1,800 he received related to Actonel®, Dr. F.A. received $1,800 in speaking fees from Warner Chilcott related to Atelvia®.

118.    Dr. Y.C. also became an Atelvia® speaker during the Early Experience Program.  Shortly thereafter, when Dr. Y.C. did not significantly increase his Atelvia® prescribing, DM Hendrixson instructed Relator Johnson that she needed to speak to him regarding increasing his prescribing.  When Dr. Y.C. still did not increase his prescribing, DM Hendrixson confronted him during a ride along with Relator Johnson.  Hendrixson asked Dr. Y.C.: How's your speaking?  Without giving him time to fully answer, Hendrixson continued: Your numbers aren't good.  She then explicitly told him: Schirrell can't schedule dinners [i.e., paid speaking events] if you don't get clinical experience.  On another occasion, DM Hendrixson visited Dr. Y.C. without Relator Johnson present.  Dr. Y.C. subsequently told Relator Johnson about the visit and that Hendrixson had demanded that he prescribe more Atelvia® if he wished to continue

speaking. He told Relator Johnson that he was prescribing Atelvia®, but that lack of formulary coverage was preventing most of those prescriptions from being filled. Nonetheless, he conveyed to Relator Johnson that he understood that because he was a speaker, he needed to prescribe additional Atelvia®. Dr. Y.C. received $1,200 in speaking fees from Warner Chilcott related to Atelvia®.

119. Following the launch of Atelvia®, Dr. E.F. remained one of the most frequent paid speakers in Relator Johnson's district. She was selected as a speaker during the Early Experience Program because she was a strong Actonel® prescriber, and per Hendrixson's direction regarding speaker selection criteria, Relator Johnson sought to leverage speaking fees to convert Dr. E.F. to a significant Atelvia® prescriber. After beginning as an Atelvia® speaker, Dr. E.F. quickly transitioned her prescribing to Atelvia®. She understood that she needed to continue prescribing substantial quantities of Atelvia® to remain a paid speaker, and routinely asked Relator Johnson: How are my numbers? Frequently Relator Johnson and Dr. E.F. discussed Dr. E.F.'s prescribing numbers at dinner programs before the other attendees arrived. Dr. E.F. received $5,400 in speaking fees from Warner Chilcott related to Atelvia®.

120. Dr. N.G. was selected during the Early Experience Program to be a paid speaker both because he had been a strong Actonel® prescriber and because he was a thought leader or key opinion leader ("KOL"). Prior to the launch of Atelvia®, Dr. N.G. spoke at a number of programs regarding Actonel®, which DM Hendrixson suggested as a preemptive attempt to induce Dr. N.G. to convert to Atelvia® after its release. Dr. N.G. was one of Relator Johnson's most popular speakers; his programs had many attendees, and they almost always enjoyed the events. Nonetheless, DM Hendrixson questioned his selection early after he failed to prescribe a

significant quantity of Atelvia® and frequently did not use any of the product samples that were left for him.

121. During a ride along on February 17, 2011, DM Hendrixson accompanied Relator Johnson on a visit to Dr. N.G. Prior to going into the office, Hendrixson questioned Relator Johnson why Dr. N.G. was serving as a speaker but prescribing minimal Atelvia®. Hendrixson questioned Relator Johnson whether Johnson had conducted sufficient lunches and Med Eds to incentivize Dr. N.G. to prescribe Atelvia®, and Relator Johnson assured DM Hendrixson that she had. During the visit, Hendrixson expressed to Dr. N.G. her disapproval with his low prescribing and stated that she expected him to prescribe more. She then instructed Relator Johnson to schedule a number of Med Ed events right then so that Dr. N.G. would be committed. They did so. Hendrixson said that she would be watching Dr. N.G.'s numbers to see if he increased his prescribing, and Dr. N.G. stated that although he had been prescribing, he would prescribe more. Hendrixson then requested that Relator Johnson leave the room so that Hendrixson could speak to Dr. N.G. in private. When Dr. N.G. stepped out of the room, he said that he would "do better" and conveyed that he understood that he needed to increase his prescribing of Atelvia® if he wished to remain a paid speaker. His filled prescriptions, however, increased only modestly following the visit. Shortly thereafter, Relator Johnson ceased using Dr. N.G. as a speaker. Between October 2010 and February 2011, Dr. N.G. received $4,500 in speaking fees from Warner Chilcott.

122. Dr. D.R. served as a paid speaker for Relator Johnson on one occasion. Although he expressed his desire to do so more frequently, he was not allowed to do so because he did not prescribe a sufficient quantity of Atelvia®. In keeping with the instruction routinely given by DM Hendrixson, Relator Johnson advised Dr. D.R. that he needed to gain more "clinical

40

experience" if he wished to serve as a speaker.  Although Dr. D.R. agreed to do so, his prescribing never sufficiently increased, and he was therefore not invited to serve as a recurring speaker.  Dr. D.R. received $600 in speaking fees from Warner Chilcott for one program conducted in November 2010.

123.   Dr. E.L. had served as a paid speaker for Actonel®, and by enlisting him as an Atelvia® speaker during the Early Experience Program, Relator Johnson sought to convert him to prescribing Atelvia®. DM Hendrixson expressed her support both for his selection as speaker and the motivation for doing so.  Dr. E.L., however, did not prescribe a substantial quantity of Atelvia®, and in January or February 2011, DM Hendrixson accompanied Relator Johnson on a ride along to Dr. E.L., during which Hendrixson told Dr. E.L. that he needed to increase his prescribing of Atelvia®. Noting that he continued to serve as a speaker for Relator Johnson, DM Hendrixson asked Dr. E.L., how can you speak without clinical experience?  Dr. E.L.'s prescribing did not increase, and he was therefore not invited to continue serving as a speaker. Dr. E.L. received $2,400 in speaking fees from Warner Chilcott related to Atelvia®.

124.   In a field coaching report dated February 17, 2011, Hendrixson wrote,

> Schirrell I think you need to make sure that your speakers are writing Atelvia.  Dr. [E.F.] and Dr. [Y.C.] cannot be the only ones supporting you. [N.G.], [E.L.], [Y.K.] etc all need to be writing consistently every week. How in the world can they share their experience if they don't have any.

She continued,

> Dr. [Y.C.] should be giving you a lot more scripts. … [N.G.] [E.L.], [A.M.] etc all need to know how much their not writing is hurting you.  I can't imagine that they would continue to do this to you. Make sure that you are holding everyone accountable.

41

125.   DM Hendrixson's district was so effective in leveraging Med Eds to increase sales of Atelvia® that Senior Director of Sales for Women's Health Care Marc Moskowitz held it up as an example to the rest the country.   In a voicemail message forwarded by RSD Mike Koellhoffer and received by Relator Alexander on April 1, 2011, Moskowitz recounted a conversation with DM Hendrixson, in which Hendrixson attributed her district's high sales to its use of Med Ed events.   Moskowitz acknowledge that Med Ed events in California were unusual compared to those in the rest the country because they were required to include a speaker; Hendrixson, however, had leveraged this speaker requirement to her advantage, he said.   All speakers were required to obtain "clinical experience" with Atelvia®, and to do the "heavy lifting" required to obtain prior authorizations.   Sales representatives in Hendrixson's district competed to see who could conduct the most events, and who could take the highest decile doctors to dinner.   From January through March 2011, Moskowitz said, the ten sales representatives in DM Hendrixson's district alone conducted over 300 Med Ed events.

126.   On May 17, 2011, at a Plan of Action ("POA") meeting held in Chicago, RSD Koellhoffer told the Midwest sales representatives that their West Coast (i.e., Californian) colleagues had been particularly successful using speaker events to generate prescriptions for Atelvia®, taking speakers out two to three times per month.   Taking speakers out routinely like this, he continued, changes a physician's relationship with the representative: physicians are human, and as such, they will write more Atelvia® in response.   How often a representative should take out a speaker, Koellhoffer said, depends on what's right for that representative's particular business.   The relevant question is, he said, are you getting fair money for the value you're investing?   In a one-on-one conversation with Relator Alexander, RSD Koellhoffer told her that "the bulk" of Ateliva® prescriptions written in California were written by paid speakers.

The Midwest region, Koellhoffer said, needed to adopt an analagous strategy of signing up physicians as paid speakers in order to ensure that they obtained "clinical experience" with Atelvia®.

127.   On June 8, 2011, Lenny Paolillo, the National Sales Director for the Osteoporosis division, sent a voicemail in which he expressed dissatisfaction that the quantity of Atelvia® written by paid speakers as a portion of their total bisphosphonate prescribing was "woefully low." The minimum expectation for paid speakers, Paolillo instructed, should be that they maintain an Atelvia® share of 25 to 30% — i.e., that 25 to 30% of the bisphosphonate prescriptions that they write should be Atelvia®. "We need to raise the bar as to what we expect from our speakers," he said. Forwarding Paolillo's message, RSD Koellhoffer said: "Lenny laid down the gauntlet: 25% share as a minimum share for your speakers. And that's a moving target. It has to grow over time."

128.   These events, which were generally lavish dinners, also served as inducements to the other, non-speaker attendees. Despite the presence of the speaker, there was generally minimal discussion of Atelvia®, and none of Relator Johnson's speakers spoke much beyond five minutes; many spoke for less. In late 2010, Relator Johnson had a ride along with DM Hendrixson, during which Relator Johnson complained that conducting three to four Med Eds per week and getting home around midnight was having an adverse impact on her health. While advising that it might be possible to leave earlier on some occasions, DM Hendrixson emphasized the importance of Med Ed events to driving Atelvia® sales, and that President Reichel, RSD Tabbara, and Hendrixson all agreed that Med Eds were the key to driving business by holding attendees "accountable." By using them as dual kickbacks to the paid speakers and

43

other attendees, Warner Chilcott successfully leveraged Med Ed events to increase sales of Atelvia® far beyond what they would have been in the events' absence.

### (iv) Med Eds to Induce Prescribing of Asacol® (400 mg) and Asacol® HD

129.    The centerpiece of Warner Chilcott's strategy to promote Asacol® HD has not been clinical evidence, but rather rampant use of dinner programs and happy hours. These have entailed little, if any, discussion of clinical data and have clearly been intended as inducements to convince physicians to prescribe Asacol® HD.   Similarly, sales representatives have been instructed to make selective use of speakers' fees in order to induce potentially high-prescribing physicians to prescribe Asacol® HD.

130.    At Relator Goan's POA meeting in late 2009, which was attended by sales representatives from across the country, including from California, President Reichel responded to a question regarding how sales representatives were supposed to promote Asacol® HD over Asacol® (400 mg) by telling the gathered sales representatives that at Warner Chilcott, selling was not about clinical data but rather about business relationships and holding doctors accountable for their prescribing behavior. By "holding physicians accountable," Reichel meant that physicians owed representatives prescriptions of Asacol® HD in exchange for dinners and speakers fees. To make this happen, representatives would be expected to conduct two to three dinner events each week and add top prescribers as speakers.

131.    At Relator Goan's January 2011 POA, Director Nicola Crawford instructed the gathered sales representatives that in order to beat Lialda®, Apriso®, and Asacol® (400 mg), she expected them to maintain at least five speakers per representative. Each of these speakers was paid for multiple talks per year. Speakers with fewer than two engagements in a year were dropped. Director Crawford also instructed representatives to hold more dinner programs.

44

132.   On a ride along with DM Hawkins on February 16, 2011, Hawkins instructed Relator Goan that, given how many dinners and speaker programs Relator holds, he should be holding more physicians accountable for Asacol® HD prescriptions.  In a follow-up evaluation for this ride along, DM Hawkins wrote that Relator Goan needed to "start challenging these docs on why they aren't writing HD yet."  Hawkins additionally wrote: "If you can effectively combine an increase in reach with the appropriate business conv[ersation]s, and start holding these docs accountable while asking for the business, then your numbers should start heading in the right direction."  This is the same evaluation referenced in ¶ 82, *supra*, which DM Hawkins mailed to Mary Keslo, the head of human resources, and copied to Director Crawford, both of who also had responsibility for sales representatives in California.

(v)   Med Eds to Induce Prescribing of Doryx®

133.   Doryx® has faced heavy competition on multiple fronts, including from generically available immediate-release formulations of doxycycline and minocycline, and from branded, delayed-release formulations such as Solodyn® (minocycline) and Adoxa® (doxycycline).  Kickbacks in the form of Med Eds and speaker fees has been Warner Chilcott's primary means of inducing physicians to prescribe Doryx®.

134.   Warner Chilcott's promotional strategy for Doryx® has been so heavily reliant on kickbacks, to the exclusion of clinical or scientific promotional claims, that at their first Warner Chilcott POA meeting in late 2009, legacy P&GP sales representatives did not learn *any* medical information related to Doryx®.  Instead, managers instructed them to take dermatologists out to dinner and to add them as paid speakers, without limit.

135.   For physicians who attended these Med Eds and were the beneficiaries of Warner Chilcott's largesse, sales representatives were instructed to follow up with "business

45

conversations," during which sales representatives "held doctors accountable" for prescribing a sufficient quantity of Doryx® 150 mg. *See* ¶¶ 80, 132, *supra.*

136.  Warner Chilcott's kickbacks to health care professionals proved so effective at driving sales that the Company continued promoting Doryx® even after the entry of generic competition in May 2012. In a recent earnings call, CEO Boissonneault stated, "[I]s DORYX the asset or is the sales[ ] force the asset? We like to think here that the sales[ ]force is the asset." Transcript, *Q1 2012 Warner Chilcott PLC Earnings Conference Call – Final* (May 4, 2012), *available at* LEXIS FD (Fair Disclosure) Wire. He later reiterated, "We feel like the sales[ ]force is an asset."

> We do think that dermatologists tend to be loyal. We are going to hopefully take advantage of that and we are going to remain focused on the promotion of DORYX,

Boissonneault said.  *Id.*  "We'd rather have [sales representatives] maintaining those relationships and there's nothing wrong with them promoting Doryx." *Id.*  CFO Herendeen concurred: "We're trying to actually achieve some maintenance of DORYX market share with that field force out in the marketplace…." *Id.*

137.  Inducements in the form of speaker fees and Med Ed attendance have been the tools with which Warner Chilcott has built those relationships. Their effectiveness at driving market share was proven effective during Doryx®'s branded life, when Doryx® was only slightly differentiated from its cheaper competitors. However, the ultimate demonstration of the effectiveness of Warner Chilcott's illicit marketing practices has been their success at protecting market share when faced not only with close competitors, but with identical ones as well.

138.  On another earnings call in August, three months after the entry of generic competition, Boissonneault credited the Company's promotion with largely defending Doryx®

market share: "[A]s a result of our continued promotion in support of our DORYX brand in the face of generic competition, we've been able to maintain a reasonable share of that business to date." Transcript, *Q2 2012 Warner Chilcott PLC Earnings Conference Call – Final* (Aug. 3 2012), *available at* LEXIS FD (Fair Disclosure) Wire. Herendeen provided additional detail: "In the first quarter facing generic competition DORYX 150 [prescriptions] stayed reasonably strong," retaining 65% of all prescriptions. *Id.* "I think the sales force understands their objective and they are executing exact – very well. And indeed, as I have told you, they are a true asset," said Boissonneault. *Id.*

### 2. Gifts and Entertainment

139. In order to induce them to prescribe its drugs, Warner Chilcott has regularly provided physicians with non-educational gifts and entertainment, including golf and hunting trips as well as food and wine.

140. These gifts, which the Company explicitly instructed sales representatives were intended to influence physicians to prescribe its drugs, constituted violations of the PhRMA Code, which prohibits physician gifts "that do not advance disease or treatment education" because these gifts "may foster misperceptions that Company interactions with health care professionals are not based on informing them about medical and scientific issues." Likewise, the PhRMA Code prohibits signatories from providing "entertainment or recreational activities to health care practitioners who are not employees of the companies in any context, including situations where those practitioners are providing a legitimate service to the companies, such as when they act as bona fide consultants on an advisory board or are trained at a speaker-training meeting." Warner Chilcott's practices have also violated Cal. Health & Safety Code § 119402(a), which requires pharmaceutical companies to adopt compliance policies that are at least as rigorous as those outlined in the PhRMA Code.

47

141.    In further acknowledgement that such gifts constitute illegal inducements, Warner Chilcott has directed sales representatives to conceal them in official expense reports. For example, while representatives have been encouraged to take physicians golfing, they have been instructed not to explicitly record that they are paying for physicians' rounds. Instead, the sales representative will go to the golf course a week before the planned outing and purchase a voucher, which the representative will record in the expense reporting system as having used him- or herself. President Reichel himself endorsed this practice, telling sales representatives that if Warner Chilcott wants to pay for its own employees to go golfing during work hours, it can do so. Then, during the actual round with the physician, the representative will use the voucher to pay for the physician's round and pay again for his or her own round. The 'official story' recorded in expense reports has been that the physician paid for his own round, and Warner Chilcott only paid for dinner.

### 3.    Preceptorships

142.    Preceptorships were, until recently, another mask with which Warner Chilcott sought to disguise its kickbacks to physicians. In a typical preceptorship, a Warner Chilcott sales representative paid a high-volume doctor $250 or $300 to permit the sales representative to follow the doctor during patient examinations for an entire day. Most Warner Chilcott sales representatives were expected to perform one preceptorship per trimester. In theory, the purpose of preceptorships was to provide sales representative with insight into how doctors decide which drugs to prescribe. However, in practice, sales representatives generally did not learn anything new and rarely stayed for the entire day. Instead, the preceptorships served as a thin veil to funnel cash to physicians whom Warner Chilcott sought to induce to prescribe its drugs.

48

143.    Preceptorships were specifically targeted at physicians who had proved resistant — or at least, in the eyes of the Company, not sufficiently responsive — to Warner Chilcott's other inducements and misleading marketing practices.

144.    On November 17, 2011, Senior Marketing Director April Mitchell sent a memorandum to all sales personnel announcing that, beginning January 1, 2012, Warner Chilcott would no longer allow sales representatives to conduct preceptorships with health care professionals. No reason for this change in policy was given.

### B.    WARNER CHILCOTT'S KICKBACKS CAUSED THE SUBMISSION OF FALSE CLAIMS

145.    Between July 21, 2010 and December 21, 2010, Warner Chilcott paid Dr. Y.K. approximately $9,600, purportedly for her services as a paid speaker at 16 Med Ed events for Actonel®. *See* ¶ 104, *supra*. Between January 1, 2010 and September 17, 2010, Dr. Y.K. wrote at least 1 new prescription for Actonel® 35 mg and at least 31 new prescriptions for Actonel® 150 mg. Dr. Y.K. wrote many of these prescriptions as a result of speaker fees that Warner Chilcott paid her, or that she expected Warner Chilcott to pay her, in exchange or as a reward for prescribing Actonel®. Private insurance companies paid for at least some of the prescriptions of Actonel® written by Dr. Y.K.

146.    Between June 23, 2010 and October 19, 2010, Warner Chilcott paid Dr. F.A. approximately $1,800, purportedly for his services as a paid speaker at three Med Ed events for Actonel®. *See* ¶ 106, *supra*. Between January 1, 2010 and September 17, 2010, Dr. F.A. wrote at least 23 new prescriptions for Actonel® 35 mg and at least ten new prescriptions for Actonel® 150 mg. Dr. F.A. wrote many of these prescriptions as a result of speaker fees that Warner Chilcott paid him, or that he expected Warner Chilcott to pay him, in exchange or as a reward for prescribing Actonel®. Private insurance companies paid for at least some of the prescriptions of Actonel® written by Dr. F.A.

49

147. Between April 13, 2010 and November 9, 2010, Warner Chilcott paid Dr. Y.C. approximately $2,300, purportedly for his services as a paid speaker at four Med Ed events for Actonel®. *See* ¶ 107, *supra*. Between January 1, 2010 and September 17, 2010, Dr. Y.C. wrote at least 11 new prescriptions for Actonel® 35 mg and at least 80 new prescriptions for Actonel® 150 mg. Dr. Y.C. wrote many of these prescriptions as a result of speaker fees that Warner Chilcott paid him, or that he expected Warner Chilcott to pay him, in exchange or as a reward for prescribing Actonel®. Private insurance companies paid for at least some of the prescriptions of Actonel® written by Dr. Y.C.

148. Between June 8, 2010 and December 22, 2010, Warner Chilcott paid Dr. E.F. approximately $13,200, purportedly for her services as a paid speaker at 22 Med Ed events for Actonel®. *See* ¶ 108, *supra*. Between January 1, 2010 and September 17, 2010, Dr. E.F. wrote at least 16 new prescriptions for Actonel® 35 mg and at least 55 new prescriptions for Actonel® 150 mg. Dr. E.F. wrote many of these prescriptions as a result of speaker fees that Warner Chilcott paid her, or that she expected Warner Chilcott to pay her, in exchange or as a reward for prescribing Actonel®. Private insurance companies paid for at least some of the prescriptions of Actonel® written by Dr. E.F.

149. Between May 24, 2010 and December 6, 2010, Warner Chilcott paid Dr. E.L. approximately $3,250, purportedly for his services as a paid speaker at six Med Ed events for Actonel®. *See* ¶ 109, *supra*. Between January 1, 2010 and September 17, 2010, Dr. E.L. wrote at least 5 new prescriptions for Actonel® 35 mg and at least 14 new prescriptions for Actonel® 150 mg. Dr. E.L. wrote many of these prescriptions only as a result of speaker fees that Warner Chilcott paid him, or that he expected Warner Chilcott to pay him, in exchange or as a reward for

prescribing Actonel®. Private insurance companies paid for at least some of the prescriptions of Actonel® written by Dr. E.L.

150.  Between January 21, 2011 and April 6, 2011, Warner Chilcott paid Dr. Y.K. approximately $6,000, purportedly for her services as a paid speaker at ten Med Ed events for Atelvia®. *See* ¶ 116, *supra*. Based on prescribing reports that Relator Johnson reviewed while employed by Warner Chilcott, Dr. Y.K. prescribed a significant quantity of Atelvia® between January and April 2011. Dr. Y.K. wrote many of these prescriptions as a result of speaker fees that Warner Chilcott paid her, or that she expected Warner Chilcott to pay her, in exchange or as a reward for prescribing Atelvia®. Private insurance companies paid for at least some of the prescriptions of Atelvia® written by Dr. Y.K.

151.  Between March 1, 2011 and March 21, 2011, Warner Chilcott paid Dr. F.A. approximately $1,800, purportedly for his services as a paid speaker at three Med Ed events for Atelvia®. *See* ¶ 117, *supra*. Based on prescribing reports that Relator Johnson reviewed while employed by Warner Chilcott, Dr. F.A. wrote a number of prescriptions of Atelvia® between January and April 2011. Dr. F.A. wrote many of these prescriptions as a result of speaker fees that Warner Chilcott paid him, or that he expected Warner Chilcott to pay him, in exchange or as a reward for prescribing Atelvia®. Private insurance companies paid for at least some of the prescriptions of Atelvia® written by Dr. F.A.

152.  Between January 28, 2011 and February 11, 2011, Warner Chilcott paid Dr. Y.C. approximately $1,200, purportedly for his services as a paid speaker at two Med Ed events for Atelvia®. *See* ¶ 118, *supra*. Based on prescribing reports that Relator Johnson reviewed while employed by Warner Chilcott, Dr. Y.C. wrote a number of prescriptions of Atelvia® between January and April 2011. Dr. Y.C. wrote many of these prescriptions as a result of speaker fees

that Warner Chilcott paid him, or that he expected Warner Chilcott to pay him, in exchange or as a reward for prescribing Atelvia®. Private insurance companies paid for at least some of the prescriptions of Atelvia® written by Dr. Y.C.

153.    Between January 19, 2011 and April 5, 2011, Warner Chilcott paid Dr. E.F. approximately $5,400, purportedly for her services as a paid speaker at nine Med Ed events for Atelvia®. *See* ¶ 119, *supra*. Based on prescribing reports that Relator Johnson reviewed while employed by Warner Chilcott, Dr. E.F. wrote a number of prescriptions of Atelvia® between January and April 2011. Dr. E.F. wrote many of these prescriptions as a result of speaker fees that Warner Chilcott paid her, or that she expected Warner Chilcott to pay her, in exchange or as a reward for prescribing Atelvia®. Private insurance companies paid for at least some of the prescriptions of Atelvia® written by E.F.

154.    Between October 7, 2010 and February 7, 2011, Warner Chilcott paid Dr. N.G. approximately $4,500, purportedly for his services as a paid speaker at seven Med Ed events for Actonel® and Atelvia®. *See* ¶¶ 120-121, *supra*. Based on prescribing reports that Relator Johnson reviewed while employed by Warner Chilcott, Dr. N.G. wrote a number of prescriptions of Atelvia® between January and April 2011. Dr. N.G. wrote many of these prescriptions as a result of speaker fees that Warner Chilcott paid him, or that he expected Warner Chilcott to pay him, in exchange or as a reward for prescribing Atelvia®. Private insurance companies paid for at least some of the prescriptions of Atelvia® written by Dr. N.G.

155.    Between January 25, 2011 and February 24, 2011, Warner Chilcott paid Dr. E.L. approximately $2,400, purportedly for his services as a paid speaker at four Med Ed events for Atelvia®. *See* ¶ 123, *supra*. Based on prescribing reports that Relator Johnson reviewed while employed by Warner Chilcott, Dr. E.L. wrote a number of prescriptions of Atelvia® between

January and April 2011. Dr. E.L. wrote these prescriptions as a result of speaker fees that Warner Chilcott paid him, or that he expected Warner Chilcott to pay him, in exchange or as a reward for prescribing Atelvia®. Private insurance companies paid for at least some of the prescriptions of Atelvia® written by Dr. E.L.

## VI.   FACTS AND ALLEGATIONS REGARDING FALSIFICATION OF PRIOR AUTHORIZATION REQUESTS

### A.   WARNER CHILCOTT'S SALES REPRESENTATIVES FALSIFIED, AND INDUCED STAFF TO FALSIFY, PRIOR AUTHORIZATION REQUESTS

156.    Faced with unfavorable formulary status and payor resistance to reimbursing for many of its drugs, particularly Atelvia®, Warner Chilcott has falsified and caused the falsification of prior authorization requests in order to obtain reimbursement. In some instances the Company has induced office staff to submit false requests for its drugs; in other instances, its sales representatives have themselves reviewed patient files and filled out prior authorization requests. In both scenarios, the Company has fabricated the reasons on the requests why patients require its particular drugs. In doing so, Warner Chilcott has not only made false statements material to false or fraudulent claims, but it has also wantonly disregarded patient privacy protections under HIPAA.

157.    Most commercial prescription drug plans have preferred drug lists known as "formularies," which designate drugs covered by the plan. Formularies are critical mechanisms of controlling prescription drug program costs because they incentivize patients to make efficient and economical choices when medically suitable alternatives exist. If a drug is on formulary, it will be covered when prescribed (potentially subject to restrictions to ensure that it is being properly prescribed). A formulary generally includes at least one drug in each therapeutic category.

158.    In most instances, drugs that are not on formulary are not covered by the plan, and patients must pay the full cost themselves.  However, plans will make an exception and cover a non-formulary drug if the drug is medically necessary for a particular patient, i.e., if there is a reason why the on-formulary medication is not an acceptable alternative.  42 C.F.R. § 423.578. Common reasons include contraindications of the formulary medication to other medications that the patient is already taking, or a prior adverse experience of the patient to the formulary-listed medication.   In such cases, the prescribing physician requests a "prior authorization" (also known as an "exception request" or "coverage determination request") for the patient to receive coverage for the non-formulary drug.  A legitimate clinical reason must exist to grant the prior authorization request.

159.    The information included on prior authorization requests, including the information that Warner Chilcott has falsified, has been material to insurers' decision to pay or reimburse a claim for the requested drug product.

160.    While Warner Chilcott's official training materials instruct sales representatives not to mention the existence of the prior authorization process and not to participate in the completion of prior authorizations, in practice sales representatives have done both those. Indeed, management has instructed sales representatives to actively manipulate the prior authorization process to increase sales of the Company's drugs.  At the instruction of their managers, sales representatives have (1) induced physicians and staff to complete prior authorization requests; (2) coached physicians and staff on language, often false, to include in prior authorization requests; and (3) themselves completed and submitted prior authorization requests, including by reviewing patient files.

54

161.    Sales representatives have regularly been evaluated on their success at inducing staff to aid in submission of false prior authorization requests. At Warner Chilcott, doing so is a key part of the "total office call" — i.e., a sales call that goes beyond speaking only to physicians but also involves office staff. The "Sales Representative Performance Evaluation & Coaching Report" template for third trimester 2011 included the category "Builds Staff Allies and executes Total Office Calls with excellence."

162.    During an office visit to Dr. Y.C. during summer 2010 by Relator Johnson and DM Hendrixson, Hendrixson asked a staff member at the front desk if Relator Johnson had previously talked to her about how to get prior authorizations pushed through. The staff member told Hendrixson yes, that Relator Johnson had done so; however, the staff member said that she had forgotten the language to include on the prior authorization requests and asked Relator Johnson if she would write it down. Relator Johnson stated to Hendrixson that she did not want to write the requested information, and asked if Hendrixson wanted to. Aware of the illegality of the Company's practices, Hendrixson said no, that she did not want to write it either. Hendrixson's declination to write the language that she wished the staff member to submit on the prior authorization request was only prompted by her desire to avoid creating evidence of wrongdoing. She still expected Relator Johnson to convey the information to the staff member, which Relator Johnson did while Hendrixson observed, without objection, the staff member writing it down.

163.    Following the July 2010 POA meeting, DM Hendrixson held a teleconference during which she instructed sales representatives in her district of the importance of helping office staff with completion of prior authorizations, and of routinely bringing treats or lunches in order to incentivize them to do so.

164.     During another ride along in September 2010, DM Hendrixson provided Relator Johnson with advice on how to increase her sales of Atelvia®, and recommended, as she had previously, that Johnson contact Eduardo Chang, another sales representative in her district who was one of the most successful sales representatives in the country thanks to his involvement in his offices' submissions of prior authorization requests. Hendrixson explained that Atelvia® sales were concentrated among a select number of physicians, among whom a physician in Chang's territory was one. Chang, Hendrixson conveyed to Relator Johnson, spent considerable time this physician's office, where he brought the staff lunches and helped them push through prior authorizations. Hendrixson instructed Relator Johnson to speak to Chang one-on-one in order to learn the details of how Chang was pushing through the prior authorizations. Indicating, as Relator Johnson would later confirm, that Hendrixson knew the answer but did not wish to be the one to tell Johnson about Chang's illegal conduct, Hendrixson advised Johnson that she would see similar results if she followed Chang's lead, and that to allow her to do so was why Warner Chilcott's sales representatives were given such large budgets.

165.     As instructed, Relator Johnson contacted Eduardo Chang, who told her that his success at pushing through prior authorizations resulted from a combination of coaching staff on what language to include on the prior authorization forms and inducing them with breakfasts and lunches to actually complete the forms, as well as himself pre-filling the prior authorization forms and providing them to office staff. He advised Relator Johnson that she needed to increase visits to her target offices from once per week to a few times per week, and bring an inducement to the staff each time. As Hendrixson and multiple ranking reports conveyed, Chang's falsification of prior authorization requests successfully drove sales of Atelvia®. Some of these sales were paid for by private insurers.

56

166. Shortly thereafter, Relator Johnson attended a Med Ed event at Crustaceans Beverly Hills, 9646 South Santa Monica Boulevard, Beverly Hills, CA 90210, where she saw fellow sales representative Erica Handalian, who was conducting a separate Med Ed. They spoke at the bar, where Handalian told Relator Johnson that she was causing prior authorizations to be submitted and approved by bringing drinks and treats to physicians' offices on weekends, going through patients' files, and assisting staff to complete the prior authorizations. On information and belief, Handalian instructed the staff what language to include, or herself included fraudulent language, on the prior authorization requests. Handalian stated that DM Hendrixson knew precisely what she was doing, but put her finger over her lips to signal to Relator Johnson not to repeat the information.

167. In January 2011, Eduardo Chang conducted a teleconference during which he provided sales representatives in Hendrixson's district with an abbreviated training on his practices filling out and assisting staff in filling out prior authorization forms. During the call, Chang told sales representatives which diagnosis codes he had used to successfully get prior authorization requests approved. On January 7, 2011, he sent out the same codes via email, writing: "Here's a few info that you might need it for a PA or to help your billing staff."

168. At DM Hendrixson's insistence, on January 25, 2011, Relator Johnson spoke to Chang to obtain additional detail about his involvement in submitting prior authorization requests for Atelvia®. Chang told Relator Johnson that in order to make it as simple as possible for staff to submit the prior authorization requests, he pre-filled the request forms with various reasons why Atelvia® was required, made 20 to 30 copies, and gave these copies to the office staff.

57

169.    Shortly thereafter, at DM Hendrixson's recommendation, Relator Johnson spoke to sales representative Eric Torres, who Hendrixson said had had success pushing through prior authorizations. Relator Johnson called Torres, who told her some of the specific reasons that he was instructing office staff to write on prior authorization requests to obtain approval for Atelvia®. These reasons included, 'patient is GI intolerant,' 'patient tried Fosamax and failed,' and 'patient tried Boniva and failed.' Relator Johnson requested that Torres send her this language in writing, and while he agreed at the time, he never did so. Torres was at the forefront of Warner Chilcott's prior authorization scheme and demonstrated his prior authorization tactics to Hendrixson, who in turn demonstrated them to members of Warner Chilcott's upper management, including President Carl Reichel.

170.    On February 1, 2011, President Reichel sent a voicemail, which was subsequently forwarded throughout the nation, in which he advocated using Med Eds as inducements to staff to "force through" prior authorization requests. Reichel instructed:

> And if it's an objection like something about prior auths, what I can tell you is the reps who are getting it done have tremendous relationships with the medical assistants, and they force through the prior auth. In other words, they work with the staff and explain to them what needs to be accomplished, etc. One of the things I've heard which is a good idea is having medical assistants for a Med Ed program. They can hear about the product and why it is so important to do the prior auth, and if you have somebody who is a medical assistant that understands the mechanics of how to work these prior auths, I think that also can be beneficial for that person to you know come out to dinner.

171.    Reichel continued, "So I think this has to become, you know, a core competency of Warner Chilcott is how to work with the prior auth."Although Warner Chilcott provided sales representatives with compliance training that described the illegality of the Company's practices,

managers regularly made clear that the training was offered only for "legal reasons," and that representatives should disregard the training and instead continue to illegally falsify prior authorization requests. In response to a February 11, 2011 memorandum stating that sales representatives should only mention the prior authorization process to doctors rather than participate in it, Relators Alexander and Goan were told by their managers that "this is a corporate thing," and that as sales representatives they were expected to continue to help physicians' staff complete prior authorizations.

172. Additional instances of the Company's falsification of prior authorizations with respect to individual drugs are detailed in the relevant sections, *infra*.

### 1. Falsification of Prior Authorization Requests for Atelvia®

173. When Atelvia® entered the market in January 2011, it was only minimally differentiated from and far more expensive than many of its competitors, some of which were available generically. Warner Chilcott also lacked contracts with most managed care plans, which would have allowed the plans to purchase Atelvia® at a favorable rate, and thus Atelvia® lacked status on those plans' formularies. As a result, even if Warner Chilcott successfully induced physicians to prescribe Atelvia® using the litany of kickbacks described above, most insurance companies would not pay for the drug. Rather than forcing their patients to unnecessarily pay hundreds of dollars out of pocket, physicians would then switch patients to a competitor that did have coverage.

174. Warner Chilcott's solution to overcome insurers' restrictions has been to pay kickbacks to office staff to submit prior authorization requests, using Med Eds, lunches, and other treats as inducements to staff to do the time-consuming work of submitting the requests. By doing so the Company has sought to evade formulary incentives that direct patients to more economical medications and thereby lower insurers' costs.

59

175.    However, even with both physicians and staff successfully bribed and willing to prescribe Atelvia® and submit formulary exception requests, they still lacked valid reasons to write on those requests to convince payors to approve them.  Prior authorization requests offer a mechanism of obtaining medically necessary therapies when no formulary alternative exists, but the reality was of course that formulary alternatives including alendronate, ibandronate, and even Actonel® *did* exist.

176.    So Warner Chilcott itself made, and induced office staff to make, false statements on prior authorization requests attesting to the unsuitability of other oral bisphosphonates as well as the unique suitability and medical necessity of Atelvia®.  In some instances Warner Chilcott fed these false statements to staff members, who in turn wrote them on the forms; in others, Warner Chilcott sales representatives themselves filled out the prior authorization requests with these false statements.  Relying on these false statements, insurers and their prescription drug plan administrators approved the prior authorization requests and made reimbursements for the accompanying prescriptions of Atelvia® as a result.  These false statements were material to the private insurers' decisions to make the concomitant reimbursements.

177.    One of the pioneers, and most egregious examples, of Warner Chilcott's falsification of prior authorization requests was Prabhakar "Mo" Polani, a sales representative in Walnut Creek, California.  On January 13, 2011, Polani sent a voicemail to his district in which he explicitly described his involvement submitting false prior authorization forms and violating patient HIPAA protections in the process:

> I have been doing lots of prior authorizations I should say and I go down there by 5, 5:30, sit down with the different clinics and I help those girls to do a prior authorization, basically and, what I do is like, I see why it's not covered and what the patient was earlier taking.  Based on that we request,

1
2
3
4
5
6

> basically most of them went through, when I said compliance and upper GI issues. But other than that, we always put, I always put, 'there it is a complication of having a secondary fracture' so, that, I think that's the wordings which basically makes me a win-win here and out of almost like 24 prior authorizations, 25 prior authorizations I have done in these two days, almost like 18, 19 have gone through.

7  This voicemail was subsequently forwarded across the country through RSDs Sirine Tabbara and

8  Mike Koellhoffer as a "success story" to be emulated by other sales representatives.  Polani's

9  district manager, Tim Garcia commented: "[T]here's many different things you can put on the

10  prior authorizations to get them approved, such as compliance, GI tolerability and GI tolerability

11  [repetition in original] so, great job Mo."  RSD Sirine Tabbara, also complimentary, added that

12  sales representatives and office staff should handle the fabrication of reasons for Atelvia®'s

13  medical necessity: "Doctors should not get involved in this. They should know nothing about

14  the process or what they need to do."

15

16      178.   In forwarding Polani's message, Koellhoffer attested to the success of the

17  fraudulent prior authorization requests at obtaining reimbursements for Atelvia®: "He's talking

18  here about his ability to get 18 out of 25 prior authorizations approved in 24 hours...."  As a

19  result, Polani was the second-ranked Atelvia® sales representative in the country.

20

21      179.   District Manager Julie Johnson discussed the importance of enlisting the help of

22  office staff in filling out prior authorization requests during a breakout session at the Atelvia®

23  launch meeting, held January 3-6, 2011, in Orlando, Florida.  She highlighted California

24  representative Eduardo Chang, who was himself filling out request forms, as an example of what

25  other sales representatives should be doing.   In response to sales representative Pete

26  Zimmerman's concerns that Chang's practices violated HIPAA, DM Johnson stated: In this

27

28
                                              61

company, it's the results that matter. At the time, Chang was the third-ranked Atelvia® representative in the country.

180. Sales representative Jeff Iko of Pasadena, California, quit his job in February 2011 after District Manager Tina Hendrixson instructed sales representatives to ignore the official policy of non-involvement with prior authorizations. Hendrixson further instructed that any sales representative *who did not* go through patient charts and fill out prior authorizations would be fired. Hendrixson was rewarded with a $250,000 bonus and a promotion to regional manager. Randy Pierce, another California district manager turned regional manager who was an early instigator of the prior authorization scheme, was similarly rewarded.

181. In a field coaching report dated February 17, 2011, DM Hendrixson instructed Relator Johnson to "smooth ... out" her relationship with an office staff member ("insurance girl") "since she is handling the prior auths and pharmacy call backs."

182. During the May 2011 POA meetings, sales representatives across the country received identical instructions to emulate the success of sales representatives on the West Coast by assisting staff to falsify prior authorization requests. Relator Alexander's POA meeting was held May 16-17, 2011, in Chicago, Illinois, where RSD Koellhoffer told sales representatives that their colleagues on West Coast, particularly in Los Angeles, had already seen success by filling out prior authorization requests.

183. In a one-on-one conversation during the same meeting, sales representative Brooklyn Rosene told Relator Alexander that her "best friends" were among the top-selling Atelvia® representatives in California. Rosene had recently returned from a vacation to visit these representatives, during which she learned that the secret to their success was personally filling out the prior authorization forms on behalf of physicians. Their managers, including Tina

Hendrixson and Randy Pierce, directed them to ignore official compliance memoranda and told them that if they did not complete prior authorizations in this way, they would not be able to keep up with their fellow sales representatives and would therefore be fired.

184.    Sales representatives in other regions received the same instructions.    Sales representative Timothy Toups attended a POA meeting in Dallas on May 24, 2011, where sales representatives were instructed to spend time with staff in order to discuss specific wording that would facilitate approval of prior authorizations.  Representatives were told that, in California, over 95% of all Atelvia® prescriptions were generated due to involvement by a sales representative in the prior authorization process.  In addition, representatives were instructed to work with staff to flag charts of patients to switch from competing bisphosphonates to Atelvia®. National Sales Director for the Osteoporosis Division Lenny Paolillo and West Regional Sales Director Randy Pierce were both present.  Subsequent to attending this POA meeting, Toups resigned his position at Warner Chilcott due to his disapproval of the illicit practices described above.

185.    Warner Chilcott's falsification of prior authorization requests has been extremely successful in obtaining reimbursements for Atelvia®.    The scheme's most enthusiastic participants have been continually listed among the top-ranked sales representatives nationally. A ranking report from April 2011 lists Mo Polani, *see* ¶ 177, as well as other active participants in the Company's falsification of prior authorizations, among the top-ranked sales representatives.

> ### 2.    Falsification of Prior Authorization Requests for Doryx®

186.    Because Doryx® confers at best a modest additional benefit but is exorbitantly more expensive than numerous competing products, most payors and prescription benefit managers have refused to include Doryx® on their formularies.  *See* ¶¶ 157-159.  As a result,

most patients who are prescribed Doryx® must either bear the full cost of Doryx®, which is around $600 per month, or switch to one of many on-formulary alternatives, which generally have modest copayments.   In a typical scenario: (1) a physician writes a prescription for Doryx®; (2) a pharmacist submits that prescription to the patient's insurer for payment; (3) the insurer denies payment because Doryx® is off formulary; (4) the pharmacist calls the physician to recommend an on-formulary alternative; and (5) seeking to spare his patient the $600 per month cost of Doryx®, the physician prescribes the patient a suitable on-formulary alternative. It is largely as a result of this scenario that Relator Goan estimates that only 10% of Doryx® prescriptions that are written are actually filled.

187.    Warner Chilcott has circumvented these formulary restrictions by inducing staff to complete, and in many instances by itself completing, prior authorization requests for Doryx®.   These prior authorization requests attested that purportedly special circumstances warranted the insurer to disregard its standard policy and pay for Doryx®; however, the statements that Warner Chilcott fed to staff for inclusion on the requests, or itself wrote on the requests, were false or fraudulent.

188.    Starting in early February 2011, district managers sent instructions via voicemail to sales representatives throughout the nation to "partner[] with the staff" and "partner[] up with your offices"  to fraudulently complete prior authorizations for Doryx®.   Usually these instructions took the form of success stories from sales representatives, who sent the stories to their district managers, who forwarded them to national head of Dermatology Nicola Crawford, who in turn forwarded or "cascaded" the stories to district managers and sales representatives throughout the nation. At each step, managers added praise for the illegal practices of the sales representative who originated the voicemail chain, and instructed other sales representatives to

64

emulate those illegal practices.  Relator Goan received numerous such messages that were forwarded through Crawford.

189.    Through these success stories, managers instructed sales representatives to feed staff members specific information to ensure approval of prior authorization requests for Doryx®.  'Good stories to tell' about why Doryx® should not only be prescribed but submitted for prior authorization included: 'forgetful about taking BID [twice-daily] drug,' 'stomach sensitivity,' 'trouble swallowing,' and 'dizziness from other drugs.'  Similarly, success stories advocated use of 'medical advocates' such as nurses and physician assistants to steer patients to Doryx® and away from formulary-listed drugs by asking patients leading questions, such as whether they had a sensitive stomach or were averse to large pills or generic medications.

190.    Sales representatives received similar instructions in other forums.  On February 7, 2011, VP Crawford hosted a POA teleconference, during which participants discussed the process for filling out prior authorization forms and sales representatives shared their success stories, including how to complete the "reasons" section on a prior authorization form.  Several representatives shared that they had successfully filled in this section of forms for offices.  Others openly discussed training office staff on what to write on prior authorization forms in order to obtain approval.

191.    During the call, sales representatives also shared their success leveraging meals and gifts as kickbacks to induce office staff to submit prior authorization requests for Doryx®.  Frequently completing prior authorization requests imposes a significant burden on staff members, who must not only take the time to fill out each individual form but also navigate the divergent forms and submission requirements among insurers.  Without staff support, physicians would generally acquiesce to prescribing suitable on-formulary alternatives that did not require

prior authorization. Thus, in order to achieve the staff support necessary to convince them to do the work to complete and submit numerous prior authorization requests for Doryx®, Warner Chilcott has strongly emphasized the need for sales representatives to "partner" with office staff. "Partnering" has encompassed not only feeding staff members language for inclusion on the prior authorization request forms but also inducing or rewarding them through Med Eds, lunches, and other gifts. Sales representatives were instructed to do just that during the call with VP Crawford. If the office staff nonetheless remained reluctant to assist in the Company's scheme, sales representatives were instructed to obtain the support of the office manager, who it similarly induced and rewarded, to force them to do so. VP Crawford led similar calls throughout the country, including, on information and belief, for sales representatives in California.

192.   In another instance, VP Crawford forwarded across the nation a voicemail from Atlanta sales representative Stefani Silverman. In the message, Silverman stated even more explicitly that office staff were expected to complete prior authorization requests in exchange for kickbacks provided by Warner Chilcott. Referring to the time it took staff to complete the requests, Silverman stated, "I'm sorry, but you owe that to me... I take great care of your office." She continued:

> [Y]ou can do that for me. I take great care of you.... I'm not just there to drop off samples and to bring them cookies and bagels and lunch. Like they, I basically was like, you know, I deserve this.

DM Moore emphasized the same message when she forwarded the conversation to VP Crawford, summarizing Silverman's message as: "I truly partner with you guys, and I work my butt off for you, and if you have to do a prior auth here and there, I deserve it...." VP Crawford in turn described Silverman's tactics as a "the recipe for success."

66

193.   DM Jake Hawkins conveyed the same message to sales representatives in a voicemail during which he summarized a recent conversation between him and VP Crawford:

> We have a lot of new hires that have been consistently building relationships and continued to support these offices, and now it's time for them to return the favor. And if you break it down, and you ask them if there is anything they disagree on those three levels, product, company and rep, then they are gonna agree with you. And once you get that agreement and establishment that we are fully supporting them, that's when we have to ask them to return the favor, and that's when we have to start teaming up with these offices and partnering up with them and asking them for their support and an extra step and filling out a prior authorization or two which shouldn't be that hard."

194.   President Reichel himself emphasized the importance of sales representatives partnering with office staff to push through prior authorizations in a voicemail message that was forwarded through VP Crawford. Reichel stated, "[A]nd it's going to require a lot of the, you know, time for the representatives to work with their medical assistants and get those prior auths, but that is part of the job...."

195.   In a subsequent voicemail message, again forwarded through VP Crawford and received by Relator Goan on March 17, 2011, President Reichel indicated that Warner Chilcott's illicit tactics had been successful, stating that for the first time that year, Doryx® was growing and had obtained 7,699 prescriptions and a 2.5% market share. The key to further sales growth, Reichel stated, was "heavy lifting with talking to doctors about prior authorizations."

**B.   WARNER CHILCOTT'S FALSIFICATION OF PRIOR AUTHORIZATION REQUESTS VIOLATED CAL. INS. CODE §§ 1871.7(a) & 1871.7(b)**

196.   Warner Chilcott's falsification of prior authorization requests, as well as its inducement of office staff members to falsify prior authorization requests, have constituted violations of California Penal Code §§ 550(a)(5), 550(a)(6), 550(b)(1), and 550(b)(2). The

67

Company's actions thereby also violated California Insurance Code § 1871.7(b), which imposes civil penalties and other remedies for violations of the aforementioned provisions of the Penal Code. Specifically, by fraudulently filling out prior authorization requests or inducing staff to do the same, with the knowledge that those requests would be submitted to obtain payment for Warner Chilcott drugs, Warner Chilcott itself did, or aided, abetted, solicited, or conspired with another person to: knowingly prepare, make, or subscribe writings, with the intent to present or use them, or allow them to be presented, in support of false or fraudulent claims in violation of Cal. Penal Code § 550(a)(5); and knowingly make or cause to be made false or fraudulent claims for payment or health care benefits in violation of Cal. Penal Code § 550(a)(6).

197.   Moreover, by fraudulently filling out prior authorization requests or inducing staff to do the same with the knowledge that those requests would be submitted to obtain payment for Warner Chilcott drugs, Warner Chilcott itself did, or knowingly assisted or conspired with another person to: present or cause to be presented written or oral statements as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statements contained false and/or misleading information concerning one or more material facts in violation of Cal. Penal Code § 550(b)(1); and prepare or make any written or oral statement that was intended to to be presented to an insurer or insurance claimant in connection with, o rin support of, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contained false or misleading information concerning one or more material facts in violation of Cal. Penal Code § 550(b)(2).

198.   Finally, by making it a part of its sales representatives' job responsibilities to work with or induce staff to fraudulently complete prior authorization requests, Warner Chilcott knowingly "employ[ed]" runners, cappers, steerers or other persons to procure clients or patients

68

to perform or obtain services or benefits under a contract of insurance or that were the basis for claims against insured individuals' insurers in violation of California Insurance Code § 1871.7(a).   Alternatively, by paying office staff members kickbacks to complete prior authorizations, Warner Chilcott knowingly "employ[ed]" runners, cappers, steerers or other persons to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that were the basis for claims against insured individuals' insurers in violation of California Insurance Code § 1871.7(a).

## CAUSE OF ACTION
### (Violation of the Insurance Fraud Prevention Act, Cal. Ins. Code §§ 1871.7(a) & 1871.7(b))

199.    Relators re-allege and incorporate the allegations in paragraphs 1 through 198 as if fully set forth herein.

200.    Defendants violated Cal. Ins. Code § 1871.7(a) by knowingly employing health care professionals by paying them kickbacks to procure clients or patients to perform or obtain services or benefits under a contract of insurance.   In the alternative, Warner Chilcott violated Cal. Ins. Code § 1871.7(a) by knowingly employing sales representatives to pay health care professionals kickbacks, to cause health care professionals to be paid kickbacks, and/or to falsify or cause health care professionals to falsify prior authorization requests, all in order to generate and/or obtain payment for prescriptions that would eventually be paid for by private insurance companies.

201.    By their payment of kickbacks and/or falsification of prior authorization requests, Defendants knowingly prepared, made, and/or subscribed writing, with the intent to present or use it, or to allow it to be presented, in support of false and/or fraudulent claims in violation of Cal. Ins. Code § 1871.7(b) and Cal. Penal Code § 550(a)(5).

69

202.   Moreover, Defendants knowingly made or caused to be made to the insurers in the State of California false claims or fraudulent claims for the payment of health care benefits that were induced by payments of kickbacks to health care professionals and/or falsified prior authorization requests, in violation of Cal. Ins. Code § 1871.7(b) and Cal. Penal Code § 550(a)(6).

203.   Defendants presented or caused to be presented written and/or oral statements as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statements contained false and/or misleading information concerning one or more material facts in violation of Cal. Ins. Code § 1871.7(b) and Cal. Penal Code § 550(b)(1).

204.   Defendants prepared or made written and/or oral statements that were intended to be presented to an insurer or insurance claimant in connection with, or in support of, claims or payment or other benefits pursuant to an insurance policy, knowing that the statements contained false or misleading information concerning one or more material facts in violation of Cal. Ins. Code § 1871.7(b) and Cal. Penal Code § 550(b)(2).

205.   Warner Chilcott's payment of kickbacks to physicians and pharmacists violated California business and Professional Code § 650 and caused false claims to be submitted to insurance companies for the payment of health care benefits. Since violations of section 650 are illegal, compliance with this provision is material to treatment of claims for reimbursement by private insurance companies. Had the private insurance companies known that prescriptions for Warner Chilcott drugs, including Actonel®, Atelvia®, Asacol®, Asacol® HD, Doryx®, Enablex®, Estrace® Cream, Loestrin® 24 Fe, and Lo Loestrin®, had been written because physicians had been paid kickbacks by Warner Chilcott to do so, these companies would not have provided reimbursement for these prescriptions.

206.   The payment of kickbacks as described herein is strictly illegal and has had the direct effect of greatly increasing the amount of Actonel®, Atelvia®, Asacol®, Asacol® HD, Doryx®, Enablex®, Estrace® Cream, Loestrin® 24 Fe, and Lo Loestrin® prescriptions and the indirect effect of increasing the amount of money spent by private insurance companies for reimbursement of prescriptions.

207.   The falsification of prior authorization requests is strictly illegal and has had the direct effect of greatly increasing the Atelvia®, Asacol® HD, Doryx®, Enablex®, Loestrin® 24 Fe, and Lo Loestrin® prescriptions paid for or reimbursed by private insurance companies.

### PRAYER FOR RELIEF

WHEREFORE, Relators pray for judgment against Defendants as follows:

(a)   That civil penalties of $10,000 be imposed, pursuant to Cal. Ins. Code § 1871.7(b), for each and every fraudulent claim that Defendants presented or caused to be presented to an insurance company;

(b)   That Defendants pay, pursuant to Cal. Ins. Code § 1871.7(b), three times the amount of each claim that Defendants presented or caused to be presented to an insurance company;

(c)   That Defendants pay damages sufficient to disgorge their unlawful profit and provide restitution for their fraudulent conduct;

(d)   That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which were necessarily incurred in bringing and pressing this case, pursuant to Cal. Ins. Code § 1871.7(g)(1)(A)(iii)(I);

(e)   That the Court issue an order enjoining Warner Chilcott from continuing to engage in the fraudulent conduct alleged herein;

(f)   That this Court award such further relief as it deems proper.

## DEMAND FOR JURY TRIAL

Relators hereby demand trial by jury as to all issues so triable.


By: _Cal G Card_

**BLANK ROME LLP**
Howard M. Knee (#55048)
Colleen A. Carolan (#210755)
1925 Century Park East
Suite 1900
Los Angeles, CA 90067
Telephone: (424) 239-3439
Facsimile: (424) 239-3414

W. Scott Simmer
Thomas J. Poulin
600 New Hampshire Avenue, NW
Washington, DC 20037
Telephone: (202) 772-5800
Facsimile: (202) 772-5858

**SEEGER WEISS LLP**
Stephen A. Weiss
David R. Buchanan
Eric H. Jaso
Asa R. Danes
77 Water Street
New York, NY 10005
Telephone: (212) 584-0700
Facsimile: (212) 584-0799

*Attorneys for Relators*

Dated: March 21, 2014

72